58 P.3d 1196

Leland GONSALVES, Plaintiff–
Appellee/Cross–Appellant,

v.

NISSAN MOTOR CORPORATION IN HA-
WAI'I, LTD.; and Infiniti Motor Sales,
Inc., Defendant–Appellants/Cross–Appel-
lees,

and

John Does 1–10; Jane Does 1–10; Doe Cor-
porations 2–10, Doe Partnerships 1–10;
or Other Entities 1–10, Defendants.

No. 23505.

Supreme Court of Hawai'i.

Nov. 27, 2002.

As Amended Dec. 18, 2002.

Reconsideration Denied Dec. 24, 2002.*

* Justice Acoba dissented.

Anna M. Elento–Sneed (Terry E. Thomason, and Joanne L. Grimes, Honolulu, with her on the briefs), of Carlsmith Ball LLP, for Defendants–Appellants/Cross–Appellees Nissan Motor Corporation in Hawai'i, Ltd. and Infiniti Motor Sales, Inc.

Jerry M. Hiatt, Kamuela, for Plaintiff–Appellee/Cross–Appellant Leland Gonsalves.

Paul T. Tsukiyama and Reid M. Yamashiro, Deputies Corporation Counsel, on the briefs, for Amicus Curiae City and County of Honolulu.

Kenneth B. Hipp and Sarah O. Wang, Honolulu, of Marr Hipp Jones & Pepper, on the briefs, for Amicus Curiae Hawai'i Employers Council.

Jared H. Jossem, Honolulu, and Lynne T. Toyofuku, of Jossem & Toyofuku, on the briefs, for Amicus Curiae Society of Human Resource Management.

Ted H.S. Hong, Hilo, Assistant Corporation Counsel, on the briefs, for Amicus Curiae County of Hawai'i.

Blaine J. Kobayashi, Deputy Corporation Counsel, on the briefs, for Amicus Curiae County of Maui.

James T. Leavitt, Jr., Honolulu, on the briefs, for Amicus Curiae Consumer Lawyers of Hawai'i.

David F. Simons and Matthew J. Viola, Honolulu, of Simons Wilson Viola, on the briefs, for Amicus Curiae Hawai'i Chapter of the National Employment Lawyers Association.

John Ishihara, Honolulu, on the briefs, for Amicus Curiae Hawai'i Civil Rights Commission.

Magali V. Sunderland, Honolulu, on the briefs, for Amicus Curiae Hawai'i Women Lawyers.

Daphne Barbee–Wooten, Honolulu, on the briefs, for Amicus Curiae United States Equal Employment Opportunity Commission.

MOON, C.J., LEVINSON, NAKAYAMA, AND RAMIL, JJ., and ACOBA, J., Concurring in Part and Dissenting in Part.

Opinion of the Court by RAMIL, J.

I. *INTRODUCTION*

On appeal,[1] Defendants–Appellants/Cross–Appellees Nissan Motor Corporation in Hawai'i, Ltd. and Infiniti Motor Sales, Inc.[2] (collectively, "Nissan") argue that the circuit court erred by denying Nissan's motion for summary judgment, two motions for judgment as a matter of law,[3] and renewed motion for judgment as a matter of law[4] because Plaintiff–Appellee/Cross–Appellant Leland Gonsalves ("Gonsalves") is unable to maintain his sex discrimination, implied contract, and promissory estoppel claims. For the reasons discussed herein, we remand for entry of a judgment in favor of Nissan with respect to the sex discrimination, implied contract, and promissory estoppel claims. Furthermore, we affirm: (1) the circuit court's denial of Gonsalves's *ex parte* request for entry of default of Nissan as to Gonsalves's first amended and supplemental complaint because Nissan "defended" itself for purposes of Hawai'i Rules of Civil Procedure (HRCP) Rule 55; (2) the circuit court's denial of Gonsalves's motion for leave to file a second amended and supplemental complaint because Gonsalves's claims were sufficiently articulated in his first amended complaint; (3) the circuit court's

dismissal of Gonsalves's claim for defamation because the publication requirement of defamation cannot be based on compelled self-publication; (4) the circuit court's granting of sanctions against Gonsalves; and (5) the circuit court's denial of Gonsalves's motion for sanctions. All other points of error brought by Gonsalves and Nissan need not be addressed.

## II. BACKGROUND

On February 27, 1998, after working for about ten months at Nissan as a service department manager, Gonsalves was fired. On November 6, 1998, Gonsalves filed a complaint against Nissan, alleging (1) sex discrimination, (2) defamation, (3) promissory estoppel, and (4) intentional and negligent infliction of emotional distress.[5]

On September 28, 1999, Nissan filed a motion for summary judgment on all claims. On November 15, 1999, the circuit court denied the motion. On November 19, 1999, the court *sua sponte* reconsidered its ruling and granted summary judgment in favor of Nissan on the negligent infliction of emotional distress claim.

---

1. Defendants–Appellants/Cross–Appellees Nissan Motor Corporation in Hawai'i, Ltd. and Infiniti Motor Sales, Inc. (collectively, "Nissan") appeal from the first circuit court's: (1) judgment, filed on March 30, 2000; (2) order denying Nissan's motion for judgment after trial, filed on May 11, 2000; and (3) order denying Nissan's alternative motion for new trial or remittitur, filed on May 11, 2000. Plaintiff–Appellee/Cross–Appellant Leland Gonsalves ("Gonsalves") cross-appeals from the first circuit court's: (1) order granting in part and denying in part Nissan's motion for protective order and sanctions, filed on December 10, 1999; (2) order granting in part and denying in part Nissan's motion *in limine* to exclude irrelevant reference, evidence, and testimony relating to Neldine Torres, filed on December 27, 1999; (3) order granting Nissan's motion to strike Anna M. Elento–Sneed as a witness, filed on January 13, 2000; (4) order granting in part and denying in part Nissan's second motion for judgment as a matter of law, filed on January 19, 2000; (5) order denying Gonsalves's motion for leave to file second amended and supplemental complaint and for oral hearing thereon, filed on January 21, 2000; (6) findings of fact, conclusions of law, and order granting in part and denying in part Gonsalves's motion for attorney's fees, costs, and prejudgment interest and to set

the amount of supersedeas bond, filed on March 30, 2000; (7) judgment, filed on March 30, 2000; and (8) order denying Gonsalves's motion for sanctions, filed on May 3, 2000.

The Honorable Gail C. Nakatani presided over the order granting in part and denying in part Nissan's motion for protection order and sanctions, filed on December 10, 1999. The Honorable Victoria S. Marks presided over all other items appealed from and before this court.

2. Nissan Motor Corporation in Hawai'i, Ltd. is the parent company of Infiniti Motor Sales, Inc.

3. Although Nissan entitled its motion "Motion for Directed Verdict," Hawai'i Rules of Civil Procedure (HRCP) Rule 50 refers to "motions for judgment as a matter of law."

4. Although Nissan entitled its motion "Motion for Judgment After Trial," HRCP Rule 50 refers to "renewed motions for judgment as a matter of law."

5. At some point during the trial, Gonsalves added his implied contract claim. *See infra* n. 16.

On October 7, 1999, Gonsalves filed his first amended and supplemental complaint. Nissan had filed an answer to Gonsalves's original complaint on November 30, 1998, but did not file an answer to Gonsalves's first amended and supplemental complaint. On October 21, 1999, Gonsalves requested an entry of default as to his amended and supplemental complaint. The circuit court denied the motion.

At trial, Neldine Torres testified that Gonsalves made sexual comments to her,[6] blew on her neck, poked her sides near her bra-line, and touched her between her knee and thigh. There was testimony that Kevin Kualapai, who replaced Gonsalves as a service manager, made inappropriate comments to Torres, and Torres did not report him for sexual harassment.[7] In addition, a male employee had passed out lingerie calendars to other employees, with no objection.

Gonsalves testified that, in January 1998, Wayne Suehisa, vice president, administrator, and treasurer of Nissan Motor Corporation in Hawai'i, Ltd., informed him of Torres's sexual harassment allegations against him. Gonsalves denied the complaints. Suehisa admitted telling Gonsalves that he would get a "thorough and fair investigation," that he did not "need to get a lawyer," and that "because [Nissan was] planning on continuing to do an investigation at that point in time, [Suehisa] wasn't planning on terminating [Gonsalves]." Gonsalves testified that Suehisa also apprised him that he "didn't have to worry about losing [his] job."

On January 26, 1998, Suehisa drafted an inter-office memorandum detailing Torres's claims against Gonsalves. The next day, Suehisa composed another inter-office memorandum including Gonsalves's denial of the accusations. On January 28, 1998, Suehisa stated in an inter-office memorandum that

"[Torres] will maintain her position, as well as, [Gonsalves]."

On February 15, 1998, Gonsalves wrote a memorandum to Nissan regarding the "hostile work environment" created by Torres. He testified that "her attitude towards work was just zero" and that she "was insubordinate by not performing the duties that she was supposed to." Although Suehisa received Gonsalves's memorandum, he did not investigate the claim. Suehisa stated that he did not think he had a "legal duty" because the complaints were "performance related." Moreover, he stated that he had already moved supervisory duties over Torres from Gonsalves to Roderick Morrison, vice president and general manager of Infiniti Motor Sales, Inc.

Suehisa hired Linda Kreis to investigate Torres's allegations. Kreis testified that she interviewed and prepared statements for ten employees, including Torres and Gonsalves. After interviewing the witnesses, Kreis prepared a report summarizing the results of her investigation. She concluded that Gonsalves's "behavior ... at the time of writing the report already could be construed as creating a hostile environment" and recommended that Gonsalves "be counseled about his unacceptable behavior and disciplined in a manner to assure there's no reoccurrence." Because Kreis had not received all of the signed statements, she termed this report an "interim report of investigation."

On February 21, 1998, Kreis sent the interim report to Suehisa. Suehisa responded to the report with "major disappointment":

> You know, here we had a manager that I guess was performing our game plan, like I had mentioned, who had a game plan to grow the business, he was executing on that. He seemed to be going in the right direction operationally. And, you know, as

---

6. The comments included "I like to look at you," "You're my honey," "[I wouldn't] mind getting caught with [my] pants down depending on who it was with," and "You smell good, you make me hungry."

7. On cross-examination, Torres stated that Kualapai asked her, while she was counting money,

"How much did you make on Hotel Street last night?" Kualapai testified that he once told Torres, who had one leg on her desk, that she should "put her legs down [because] the flies were getting dizzy."

I had said earlier this morning, we were trying to, well, what I was hoping for was that we could come to a different resolution. But as you read each paragraph, as you came to find out that allegation after allegation was being corroborated by not only one witness but a number of witnesses, and that those witnesses were also bringing up things that they saw, they heard, it was very disappointing. It was d[is]heartening, actually.

On February 24, 1998, Suehisa decided to terminate Gonsalves. Given the evidence already adduced from various witnesses, Suehisa determined that he did not need the final report. At the time of Suehisa's decision, four of the affidavits, including one from Torres, had not yet been signed. One of the later-received signed affidavits was actually supportive of Gonsalves.

On February 27, 1998, Nissan terminated Gonsalves. Suehisa explained that he waited until February 27, 1998 because he wanted to see whether receipt of any of the outstanding statements would "substantially change[ ]" the facts already established. Suehisa testified that he believed he was required to "do a fair job" in investigating any alleged misconduct. In addition, Suehisa stated that Nissan's termination letter explained all of the reasons for Gonsalves's termination. The termination letter articulated that "[b]ased on Ms. Torres'[s] allegations and the corroborating statements of the witnesses, [Nissan had] concluded that [Gonsalves's] conduct toward Ms. Torres could be construed as sexual harassment and warrants disciplinary action." The letter further expounded that Gonsalves had retaliated against Torres and other employees, contrary to Nissan's harassment and discrimination policy. On cross-examination, Gonsalves admitted that he had received a copy of Nissan's Policies and Guidelines Manual.

Gonsalves testified that he applied for about forty to fifty jobs after being terminated by Nissan, but was rejected from each one. On the applications, he was required to explain the reasons for his termination by Nissan.

On December 28, 1999, at the close of Gonsalves's case, Gonsalves moved for leave to file a second amended and supplemental complaint. The court denied Gonsalves's motion.

On the same day, Nissan moved for judgment as a matter of law. The court denied the motion. On January 10, 2000, after all evidence had been introduced, Nissan again moved for judgment as a matter of law. The court granted the motion with respect to "that portion of [Gonsalves's] claim of defamation which was based on the self-publication of the reasons for [Gonsalves's] termination," and denied the remainder of the motion.

Gonsalves proposed the inclusion of a separate negligence count in the special verdict form. The court rejected Gonsalves's proposal.

On January 13, 2000, the court sent the case to the jury. On January 25, 2000, the jury returned its special verdict in favor of Gonsalves on the discrimination, promissory estoppel, and implied contract claims, and in favor of Nissan on the defamation and intentional infliction of emotional distress claims. The circuit court awarded the following amounts for a grand total of $2,918,249.59:

| | |
|---|---|
| Special Damages (for discrimination, promissory estoppel, and implied contract claims) | $1,090,597.00 |
| Punitive Damages (for discrimination claim) | $ 875,000.00 |
| General Damages (for promissory estoppel claim) | $ 140,000.00 |
| Costs (for discrimination, promissory estoppel, and implied contract claims) | $ 76,346.93 |
| Attorney's Fees (maximum awarded under discrimination claim) | $ 708,649.80 |
| Tax on Fees and Costs | $ 32,655.86 |
| Less discovery sanction awarded against Gonsalves | $ 5,000.00 |

On April 7, 2000, Nissan renewed its motion for judgment as a matter of law and, in

the alternative, for new trial or remittitur. Both were denied.

On June 8, 2000, Nissan filed a notice of appeal. On June 21, 2000, Gonsalves filed his notice of cross-appeal.

## III. STANDARD OF REVIEW

### A. Default Judgment

Application of HRCP Rule 55, which governs entry of default judgment, is reviewed for abuse of discretion. *See Stafford v. Dickison*, 46 Haw. 52, 56, 374 P.2d 665, 668 (1962); *Citicorp Mortgage, Inc. v. Bartolome*, 94 Hawai'i 422, 439, 16 P.3d 827, 844 (App. 2000); *First Trust Co. of Hilo, Ltd. v. Reinhardt*, 3 Haw.App. 589, 593 n. 5, 655 P.2d 891, 894 n. 5 (1982).

### B. Motion to Amend Complaint

A denial of leave to amend under HRCP Rule 15(a) is within the discretion of the trial court. *See Federal Home Loan Mortg. Corp. v. Transamerica Ins. Co.*, 89 Hawai'i 157, 162, 969 P.2d 1275, 1280 (1998). Thus, this court reviews the circuit court's denial of a motion to amend a complaint under the abuse of discretion standard.

### C. Special Verdict Form

A trial court has "complete discretion" whether to utilize a special or general verdict and to decide on the form of the verdict as well as the interrogatories submitted to the jury "provided that the questions asked are adequate to obtain a jury determination of all factual issues essential to judgment." *In re Hawai'i Federal Asbestos Cases*, 871 F.2d 891, 894 (9th Cir. 1989); *accord* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2505 (1971) [hereinafter, Wright & Miller]; *see also* HRCP 49(a). Although there is "complete discretion" over the type of verdict form, the questions themselves may be so defective that they constitute reversible error. Wright & Miller, *supra*, § 2508.

In analyzing alleged errors in special verdict forms, the instructions and the interrogatories on the verdict form are considered as a whole. *See Knodle[ v. Waikiki Gateway Hotel, Inc.]*, 69 Haw. 377[376],] 383–84, 742 P.2d [377,] 382–83 [ (1987) ] ("[T]he judge should explain the law of the case, point out the essentials to be proved on one side or the other, and bring into view the relation of the particular evidence adduced to the particular issues involved. All of this must be done in such a manner that the jury will not be misled.") (citations omitted) (internal quotations and brackets omitted).

*Montalvo v. Lapez*, 77 Hawai'i 282, 292, 884 P.2d 345, 355 (1994) (some brackets in original).

### D. Motion for Summary Judgment

We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.

The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion].

*Fujimoto v. Au*, 95 Hawai'i 116, 136–37, 19 P.3d 699, 719–20 (2001) (internal quotation marks and citations omitted) (brackets in original).

### E. Judgment as a Matter of Law and Renewed Motions for Judgment as a Matter of Law

A trial court's ruling on a judgment as a matter of law or a renewed motion for

judgment as a matter of law is reviewed *de novo*. *See In re Estate of Herbert*, 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999).

### F. *Conclusions of Law*

 This court reviews the circuit court's conclusions of law *de novo* under the right/wrong standard. *Child Support Enforcement Agency v. Roe*, 96 Hawai'i 1, 11, 25 P.3d 60, 70 (2001). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it. Thus, a [conclusion of law] is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Kane*, 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998) (quoting *State v. Bowe*, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994)) (citations omitted).

### G. *Sanctions*

 "This court reviews the circuit court's imposition of sanctions for discovery abuse ... under the abuse of discretion standard." *Stender v. Vincent*, 92 Hawai'i 355, 362, 992 P.2d 50, 57 (2000) (citing *Kawamata Farms, Inc. v. United Agric. Prods.*, 86 Hawai'i 214, 241, 948 P.2d 1055, 1082 (1997)). "All aspects of a HRCP Rule 11 determination should be reviewed under the abuse of discretion standard." *Canalez*, 89 Hawai'i at 300, 972 P.2d at 303 (quotation omitted) ].

*Fujimoto*, 95 Hawai'i at 137, 19 P.3d at 720.

## IV. *DISCUSSION*

### A. *Procedural Issues on Appeal*

#### 1. *Default motion*

Gonsalves argues that the circuit court erred by denying his request for entry of default under Rule 55(a) because Nissan failed to respond to his amended pleading.

 HRCP Rule 55(a) provides that when "a party against whom a judgment for affirmative relief is sought has failed to plead or *otherwise defend* as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." (Emphasis added.) This court has explained that "[w]here we have patterned a rule of procedure after an equivalent rule within the FRCP, interpretations of the rule 'by the federal courts are deemed to be highly persuasive in the reasoning of this court.'" *Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 251–52, 948 P.2d 1055, 1092–93 (1997) (citation omitted). In *First Hawaiian Bank v. Powers*, 93 Hawaii 174, 998 P.2d 55 (2000), the Intermediate Court of Appeals (ICA) examined the phrase "otherwise defend" in the District Court Rules of Civil Procedure (DCRCP) Rule 55(a), which is identical to HRCP Rule 55(a), by considering the interpretation of the similar FRCP Rule 55(a):

> Rule 55(a) obviously refers to and is designed to operate at the initial stages of a lawsuit. A complaint (or third party complaint, counterclaim, or cross-claim) is served and the party who is served must either plead, "otherwise defend," or suffer a default. The rule is written in the disjunctive. By its express language it authorizes a default only if a party fails to plead or otherwise defend. Therefore, once a party has pleaded, or has otherwise defended, may that party's subsequent conduct, such [as] a failure to appear at trial or a failure to comply with discovery requests, be considered a subsequent failure to "otherwise defend" so as to justify the entry of a default under Rule 55(a)? The proper answer is no. There is no need for this type of expansive interpretation of Rule 55(a).

93 Hawai'i 174, 185, 998 P.2d 55, 66 (App. 2000) (quoting 10 *Moore's Federal Practice* § 55.10[2][b] at 55–12.1 (3d ed.1998)). In addition, the ICA noted that "[s]ome courts have properly recognized that Rule 55(a)'s 'otherwise defend' language may not be extended to justify a dismissal once there has been an initial responsive pleading or an initial action that constitutes a defense." *Id.*

 Here, given Nissan's rigorous defense against Gonsalves's complaint, as evi-

denced by its multiple pleadings and motions, it cannot be said that default pursuant to HRCP Rule 55(a) is warranted. HRCP Rule 55(a) did not intend failure to file a pleading to vitiate the existence of months of trial. Indeed, this court has observed that, "[g]enerally, default judgments are not favored because they do not afford parties an opportunity to litigate claims or defenses on the merits." *In re Genesys Data Technologies, Inc.*, 95 Hawai'i 33, 40, 18 P.3d 895, 902 (2001) (citation omitted). Moreover, Gonsalves is unable to specify why, given the issues raised on appeal, the record is incomplete. Accordingly, the circuit court did not abuse its discretion in denying Gonsalves's motion.

### 2. *Amended complaint and special verdict form*

Gonsalves argues that the circuit court improperly denied his motion for leave to file a second amended and supplemental complaint in order to clarify his claims. Relatedly, Gonsalves argues that the circuit court erred by giving a verdict form without Gonsalves's negligence claim.

■ In pertinent part, HRCP Rule 15(a) provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." In interpreting this rule, this court has looked to the general standard applied by federal courts:

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules requires, be "freely given."

*Federal Home Loan Mortg. Corp. v. Transamerica Ins. Co.*, 89 Hawai'i 157, 162, 969 P.2d 1275, 1280 (1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

■ Here, the circuit court explained its decision to deny Gonsalves's motion to amend his complaint:

In terms of the motion to file second amended and supplemental complaint, I'm going to deny it. I think that the—the evidence that was presented is basically part and parcel of claims that have already been pled, in particular the sex discrimination and promissory estoppel claims.

Gonsalves conceded that his motion to amend was simply to "clarify" his retaliation, negligence, and implied contract claims. Because Gonsalves's filed complaint sufficiently articulated those claims, an amendment was unnecessary or "futile." Gonsalves was not precluded from arguing those claims, *cf.* HRCP Rule 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."), and in fact, the circuit court expressly stated in its denial that it was not foreclosing an implied contract claim based on *Kinoshita v. Canadian Pacific Airlines, Ltd.*, 68 Haw. 594, 724 P.2d 110 (1986). Furthermore, the jury received instructions as to all of these claims. Accordingly, the circuit court did not abuse its discretion.

■ With regard to the special verdict form, contrary to Gonsalves's assertion, the form did include Gonsalves's negligence claim. Assuming Gonsalves could prove a sex discrimination claim, that claim was premised on the negligence of Nissan in conducting a "fair and thorough" investigation. In addition, Gonsalves's claim that Nissan failed to abide by a proper standard of care was included in the defamation and intentional infliction of emotional distress claims. Thus, the circuit court submitted a special verdict form adequately addressing the issues involved and did not abuse its discretion.

### B. *Sex Discrimination*

Nissan contends that the circuit court erred by denying its (1) motion for summary

judgment, (2) two motions for judgment as a matter of law, and (3) renewed motion for judgment as a matter of law because Gonsalves was unable to prove a prima facie case for sex discrimination. Gonsalves articulated three claims of sex discrimination: (1) Nissan treated Gonsalves differently than Torres with regard to their respective complaints; (2) Nissan treated Gonsalves differently than others in the workplace who engaged in actions potentially qualifying as sexual harassment; and (3) Nissan retaliated against Gonsalves for filing a complaint by firing him and suspending Merna Nakamura.[8] We examine each of Gonsalves's bases to determine whether he has a viable sex discrimination claim.

### 1. *Differential treatment of "similarly situated" employees*

First, Gonsalves alleges that Nissan discriminated against him on the basis of sex in that a similarly-situated female employee, Torres, was not subjected to the same treatment as he was.

To prove sexual discrimination based on differential treatment of "similarly situated" employees, "[Gonsalves] must prove that all of the relevant aspects of his employment situation were similar to those employees with whom he seeks to compare his treatment." *Furukawa v. Honolulu Zoological Society,* 85 Hawai'i 7, 14, 936 P.2d 643, 650 (1997) (adopting the "similarly situated" employees analysis in *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796 (6th Cir.1994)). This court stated that "[g]enerally, similarly situated employees are those who are subject to the same policies and subordinate to the same decision-maker as the plaintiff." *Id.* This court has already examined the Sixth Circuit's holding in *Pierce* that "the comparison [between the two employees] was invalid because the two employees were not similarly situated":

The following distinctions between Pierce and Kennedy are undisputed: Pierce was a supervisor and Kennedy was not; Pierce had responsibility over three offices, whereas Kennedy was an "office administrator" with no supervisory control over any other employees; Pierce evaluated employees, including Kennedy, while Kennedy evaluated no one; and, unlike Kennedy, Pierce attended agency group meetings and was responsible for enforcement of the company's sexual harassment policy.

*Id.* at 14, 936 P.2d at 650. This court observed that the Sixth Circuit's holding focused "on a particularly relevant detail that distinguished them":

> [U]nlike Kennedy, Pierce—as a supervisor—could be considered the employer's agent, and because following this incident the employer was on notice of his behavior, the employer could itself be held liable under Title VII for sexual harassment for any such behavior in the future. This was not true of Kennedy.

*Id.* (citing *Pierce,* 40 F.3d at 803–04). The same factors that distinguished Pierce from Kennedy likewise distinguish Gonsalves from Torres. Gonsalves, unlike Torres, was a supervisor and could be considered Nissan's agent. Once Nissan had notice of Torres's allegations against Gonsalves, Nissan was potentially liable for future sexual harassment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 802, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Indeed, Gonsalves's complaint acknowledges that he was responsible for enforcing Nissan's written policies, such as the one addressing sexual harassment, with regard to Torres and other subordinates. Thus, Gonsalves and Torres were not "similarly situated" employees.

Accordingly, Gonsalves is unable to demonstrate a claim of sex discrimination based

---

**8.** Merna Nakamura, an employee at Nissan, testified that Torres openly talked about her breast enlargements. She also observed that Torres would wear "very thin and revealing" slacks, apparently with no underwear, and "bright green bra[s]" under a white top to work. Nakamura claimed that, after giving testimony favorable to Gonsalves, Nissan retaliated against her by suspending her for four weeks without pay.

on differential treatment of similarly situated employees.

### 2. Differential treatment for similar conduct

■ Second, Gonsalves contends that Nissan discriminated against him on the basis of sex in that he was "treated differently than others in the work place who engaged in similar conduct."

■ "The central focus of the inquiry in [an employment discrimination case] is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649 (citations omitted). Here, Gonsalves is claiming discrimination on the basis of sex and must therefore demonstrate by a preponderance of the evidence that there was discrimination on the basis of sex. *Id.* at 12, 936 P.2d at 648. Yet, Gonsalves cited instances where male employees made comments sexual in nature to female employees, or touched female employees inappropriately, and were not disciplined. Indeed, Gonsalves's evidence actually indicates that male employees may have been treated leniently. Thus, Gonsalves's allegations of inconsistent treatment are not based on sex and are therefore irrelevant to a sex discrimination claim. Accordingly, Gonsalves does not state a cognizable claim of sex discrimination based on differential treatment for similar conduct.

### 3. Retaliation

■ Finally, Gonsalves claims that Nissan discriminated against him on the basis of sex in that Nissan illegally retaliated against himself and Nakamura.

Under HRS § 378-2(2) (1993) it is an "unlawful discriminatory practice" for any employer to "discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part."

■ To maintain a prima facie case of retaliation under HRS § 378-2(2), one must demonstrate that:

(a) the plaintiff (i) has opposed any practice forbidden by HRS chapter 378, Employment Practices, Part I, Discriminatory Practices or (ii) has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part, (b) his or her employer, labor organization, or employment agency has discharged, expelled, or otherwise discriminated against the plaintiff, and (c) a causal link has existed between the protected activity and the adverse action[.]

*Schefke v. Reliable Collection Agency, Ltd.,* 96 Hawai'i 408, 426, 32 P.3d 52, 70 (2001) (internal quotations and citations omitted); *see also Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.2000) (setting forth the same three-part test for establishing a prima facie case under Title VII of the Civil Rights Act of 1964, which is analogous to HRS § 378-2). Filing a complaint with the Equal Employment Opportunities Commission (EEOC) and making an informal complaint to a supervisor are both protected activities.[9] *See* HRS § 378-2(2); *Ray*, 217 F.3d at 1240 n. 3; *see also EEOC v. Romeo Community Sch.*, 976 F.2d 985, 989 (6th Cir.1992).

■ There is no requirement that a retaliation claim be based on a successful discrimination claim. *See Aloha Islandair Inc. v. Tseu*, 128 F.3d 1301, 1304 (9th Cir. 1997) (observing that "the Hawai'i statute prohibiting retaliation does not condition the

---

**9.** Gonsalves later filed a charge of discrimination with the Hawai'i Civil Rights Commission (HCRC). Although such charge was marked for identification, it was not admitted in evidence. Nevertheless, even if the charge made out a reasonable claim that the employer had engaged in an unlawful employment practice, it was filed only after Nissan had fired Gonsalves. Thus, the allegedly "protected activity" occurred after the termination and cannot serve as the basis for a retaliation claim.

retaliation claim on the merit of the underlying discrimination claim"); *Moyo,* 32 F.3d at 1385 (stating that under Title VII it is not necessary that the employment practice actually be unlawful). This does not mean, however, that any belief that an unlawful employment practice has occurred will suffice for purposes of establishing retaliation. There must be a " 'reasonable belief' that the employer has engaged in an unlawful employment practice." *See Moyo,* 32 F.3d at 1385 (citation and emphasis omitted). Furthermore,

> [t]he reasonableness of [the employee's] belief that an unlawful employment practice occurred must be assessed according to an objective standard—one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims. We note again that a reasonable mistake may be one of fact or law. We also note that it has been long established that Title VII, as remedial legislation, is construed broadly. This directive applies to the reasonableness of a plaintiff's belief that a violation occurred, as well as to other matters.

*Id.* at 1385–86 (citation and emphasis omitted).

In *Balazs v. Liebenthal,* 32 F.3d 151, 155 (4th Cir.1994), the plaintiff, claiming retaliation, filed a complaint "devoid of any allegation that plaintiff was discriminated against because of his sex." Although the Fourth Circuit Court of Appeals acknowledged that the plaintiff did not have to successfully prove the underlying discrimination claim, the court held that the plaintiff could not have reasonably believed that an unlawful discrimination had occurred:

> In this case the plaintiff's claim as first filed with the EEOC simply alleged that he had been accused of doing something— sexually harassing his co-workers—which he did not do. It had nothing to do with his race, color, religion, sex or national origin. The EEOC had no more jurisdiction of this claim than it would have had of

a charge that defendant had falsely accused him of reckless driving in the company parking lot.

*Id.* at 159; *see also id.* ("It may be that the [employer's action] was wrong or even spiteful. We have emphasized, however, that Title VII is not a general 'bad acts' statute.") (quoting *Crowley v. Prince George's County,* 890 F.2d 683, 687 (4th Cir.1989)).

In the present case, Gonsalves wrote a memorandum to Morrison and Suehisa regarding the "hostile work environment" he faced:

> In 1980 the EEOC promulgated that, "If such conduct of an employee has the purpose of [sic] effect or [sic] unreasonably interfering with an individual's work performance or creating an intimidating hostile or offensive working environment," it is defined as just cause for a hostile working environment.

> Please be aware that Neldine Torre[s]'s attitude and conduct along with her daily performance, actions, insubordination of her daily job description, duties, responsibilities, and company policies, is causing a hostile working environment for myself and members of my staff. Not to mention the emotional distress caused by defamation. This emotional distress is being caused by Neldine informing members of the staff that are not involved with the allegations or were unaware of the charges filed against me. This alone is a breach of INMS company rules, "unauthorized release of confidential information[."]

> I do respect the wishes of the company, "being patient until this is resolved," but due to the daily effect it has on me and my staff, I feel that the matter described above should be addressed as soon as possible. This hostile working environment is unwelcome and is substantially affecting the work environment of reasonable persons.

Although the first paragraph appears to address the issue of illegal discrimination by invoking an EEOC guideline, the actual alle-

gations described by Gonsalves in the second paragraph do not involve any discrimination based on sex. In fact, Gonsalves clarified that Torres's conduct created a hostile work environment for not only him, but also his staff, which included both males and females. As a result, Gonsalves does not have a claim for retaliation.

We conclude that Gonsalves was, as a matter of law, unable to maintain a sex discrimination claim based on (a) differential treatment of "similarly situated" employees, (b) differential treatment of similar conduct, or (c) retaliation. Accordingly, we hold, with respect to Gonsalves's sex discrimination claim, that the circuit court erred by denying Nissan's (1) motion for summary judgment, (2) two motions for judgment as a matter of law, and (3) renewed motion for judgment as a matter of law.[10]

## C. *Promissory Estoppel*

Nissan asserts that Gonsalves was unable to establish a promissory estoppel claim and that, as a result, the trial court erred by denying its (1) motion for summary judgment, (2) two motions for judgment as a matter of law, and (3) renewed motion for judgment as a matter of law.[11]

 Generally, a claim for promissory estoppel

may arise as an application of the general principle of equitable estoppel to certain situations where a promise has been made, even though without consideration, if it was intended that the promise be relied upon and was in fact relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or result in other injustice.

*In re Herrick,* 82 Hawai'i 329, 337, 922 P.2d 942, 950 (1996) (quotation omitted). Drawing from *Restatement of Contracts* § 90 (1979), this court has outlined the elements of a promissory estoppel claim:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Ravelo v. County of Hawaii,* 66 Haw. 194, 200, 658 P.2d 883, 887 (1983). In other words, the four elements of promissory estoppel are:

(1) There must be a promise;

(2) The promisor must, at the time he or she made the promise, foresee that the promisee would rely upon the promise (foreseeability);

(3) The promisee does in fact rely upon the promisor's promise; and

**10.** The following points of error are related to Gonsalves's sex discrimination claim: (1) Nissan argues that the circuit court erred by denying its motions *in limine* to exclude relevant evidence of retaliation; (2) Nissan argues that the circuit court erred in granting Gonsalves's motion *in limine* to exclude relevant evidence of legitimate, nondiscriminatory reasons for Gonsalves's termination; (3) Nissan argues that the circuit court erred by allowing Gonsalves's expert witness, Patricia Kim Park, to testify that "regulatory agency guidance concerning the conduct of sexual harassment investigations is not a relevant standard for the conduct of an employer investigation[;]" (4) Nissan argues that the circuit court erred by failing to instruct the jury "about the legal standards for investigation of sexual harassment complaints developed by the EEOC and recognized by the U.S. Supreme Court in *Meritor Savings Bank v. Vinson* [, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986);]" (5) Gonsalves argues that the circuit court erred by granting

Nissan's motion preventing discovery as to Elento–Sneed and the Carlsmith Ball custodian of records and that the court erred by shortening time for hearing; (6) Gonsalves argues that if this court determines that evidence regarding his background is relevant, then Torres's background information is also relevant and the circuit court improperly granted Nissan's motion *in limine* to exclude certain evidence as to Torres; and (7) Gonsalves argues that he was denied both Elento–Sneed as a witness and her affidavit. As Gonsalves was, as a matter of law, unable to maintain a sex discrimination claim, this court need not address these issues.

**11.** Nissan additionally claims that the jury instructions improperly instructed on the promissory estoppel claim. Because we hold that, as a matter of public policy, Gonsalves could not maintain a promissory estoppel claim, *see* discussion *infra,* we need not consider this argument.

(4) Enforcement of the promise is necessary to avoid injustice.

*In re Herrick,* 82 Hawai'i at 337–38, 922 P.2d at 950–51 (quoting 4 R. Lord, *A Treatise on the Law of Contracts by Samuel Williston* § 8:5, at 85–95 (4th ed.1992)). The "essence" of promissory estoppel is "detrimental reliance on a promise." [12] *Ravelo,* 66 Haw. at 199, 658 P.2d at 887.

■ This court has defined a "promise" for purposes of promissory estoppel to be "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *In re Herrick,* 82 Hawai'i at 338, 922 P.2d at 951 (quoting *Restatement (Second) of Contracts* § 2(1)) (internal quotation marks omitted). More specifically, a "promisor manifests an intention" if he or she "believes or has reason to believe that the promisee will infer that intention from his [or her] words or conduct." *Id.* (quoting Restatement (Second) of Contracts § 2(1) comment b) (internal quotation marks omitted). In *Ravelo,* a couple detrimentally relied on the County Police Department's letter stating that the husband had been accepted as a police recruit. This court held that the County "could have anticipated the assurance of employment at a definite time would induce a reaction of that nature [i.e., couple quitting jobs on the island of Oahu and preparing to move to the island of Hawai'i]." *Ravelo,* 66 Haw. at 199, 658 P.2d at 887.

As the basis of his promissory estoppel claim, Gonsalves points to the following statements made by Vice President Suehisa to Gonsalves after Torres's alleged sexual harassment: (1) he would not lose his job; [13] (2) he did not need an attorney; and (3) there would be a "thorough" and "fair" investigation of Torres's allegations. Suehisa testified that it was "fair for [employees] to rely on [his] word."

■ This court will refuse to enforce promises that are against public policy. *See Konno v. County of Hawai'i,* 85 Hawai'i 61, 73–79, 937 P.2d 397, 408–415 (1997) (refusing to enforce contracts that are against public policy). This court has placed great weight on the "valuable rights" of one to seek remedies for sexual harassment and other forms of sex discrimination. *Puchert v. Agsalud,* 67 Haw. 25, 37, 677 P.2d 449, 458 (1984). Thus, this court cannot condone the violation of constitutional and statutory rights, *see* Haw. Const. art. I, § 5; [14] HRS § 378–2 (1993 & Supp.), or the shirking of a legal duty, *see* Civil Rights Act of 1964, § 701 *et seq.,* as amended, 42 U.S.C. § 2000e *et seq.* (1994), simply because it is cloaked in a promise. In its amicus curiae brief, the Hawai'i Civil Rights Commission (HCRC) pointed out that, "[t]o the extent that [employers'] promises constitute a disavowal of an employer's legal obligations to take immediate and appropriate corrective action to prevent sexual harassment, they must be treated as

---

12. Here, Nissan avers that the promissory estoppel claim, as recognized in Hawai'i, only applies to a definite promise of future rather than continued employment. But this court in *Ravelo* did not limit application of the doctrine of promissory estoppel to only offers of new employment. Rather, this court emphasized that where the elements of a promissory estoppel have been satisfied—whether in the context of new employment or continued employment—a promissory estoppel claim can be maintained. As this court has explained, the essence of promissory estoppel is not the precise nature of the promise, but rather "detrimental reliance on a promise." *Ravelo,* 66 Haw. at 199, 658 P.2d at 887; *accord Morishige v. Spencecliff Corporation,* 720 F.Supp. 829, 836 (D.Haw.1989) ("This court can find no rational basis for distinguishing promises for new employment and promises for continued job

security provided the requisite elements of [a promissory estoppel claim] are satisfied.").

13. Suehisa's inter-office memorandum regarding "Management's Conclusions," states that "[Torres] will maintain her position, as well as[ ] [Gonsalves]." Furthermore, Gonsalves testified that Suehisa assured him that he "didn't have to worry about losing [his] job."

14. Article I, section 5 of the Hawai'i Constitution provides in relevant part that "[n]o person shall be … denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry." Art. I, § 5 (1978).

unenforceable as a matter of public policy."[15]

In the present case, to the extent that Suehisa's statements could be construed as promising Gonsalves that he would retain his job regardless of the findings of the investigation, we hold that they are unenforceable as a matter of public policy. An interpretation by Gonsalves that would ensure his continued employment, despite findings that he sexually harassed others in his workplace, would be to either absolve Nissan of its obligations to take immediate and appropriate action to prevent sexual harassment or to hinder Nissan in its fulfillment of its obligations. To enforce Suehisa's "promises" after a finding of sexual harassment would be offensive to public policy. Thus, we hold that, in the present case, to the extent that promises were made to Gonsalves that he would retain his job regardless of the outcome of the investigation, those promises were unenforceable, and Gonsalves is unable to maintain a claim for promissory estoppel as a matter of public policy.

Gonsalves also bases his promissory estoppel claim on Suehisa's promise to conduct a "thorough" and "fair" investigation of Torres's allegations. Unlike the first two promises, this promise was not breached by Suehisa. Suehisa hired Linda Kreis to investigate Torres's allegations. Kreis interviewed and took the statements of nine employees, including Gonsalves and Torres, and prepared a report summarizing the results of her investigation. The report was termed an interim report because several of the statements taken by Kreiss were not yet signed. Suehisa based his decision to terminate Gonsalves on, *inter alia*, the employee's statements and the interim report, which concluded that Gonsalves had engaged in inappropriate conduct creating a hostile environment. Moreover, Suehisa waited three days before sending a termination letter to Gonsalves to await the receipt of the unsigned statements. Thus, his conduct did not constitute a breach of his promise to conduct a "thorough" and "fair" investigation.

Accordingly, with respect to Gonsalves's promissory estoppel claim, the circuit court erred by denying Nissan's (1) motion for summary judgment, (2) two motions for judgment as a matter of law, and (3) renewed motion for judgment as a matter of law.

### D. *Implied Contract*

Nissan contends that Gonsalves was unable to maintain an implied contract claim. Thus, Nissan asserts that the trial court erred by denying its (1) motion for summary judgment, (2) two motions for judgment as a matter of law, and (3) renewed motion for judgment as a matter of law.[16]

Gonsalves based his implied contract claim on the language of his employee handbook.[17] To protect against claims of breach of implied contract based upon employee handbooks, employers may use "disclaimers expressly stating that the handbook or manual is not a contract and does not alter the employment at-will relationship."[18] Practicing Law Institute, *The Employment-*

---

15. In its amicus curiae brief, the EEOC describes the "important role" that employers play in "achieving the objectives of [Title VII of the Civil Rights Act]." The focus of the EEOC's concern was that the circuit court erred by instructing the jury that it could find Nissan liable for sex discrimination if it decided that Nissan's investigation was not "fair and thorough." It argues that such error, "if not corrected, will tend to chill employers from playing the significant role assigned them in federal and state law to ensure compliance with those laws in the workplace."

16. Nissan additionally claims that the jury instructions improperly instructed on the implied contract claim. As part of the error that Nissan points to, Nissan argues that Gonsalves should not have been permitted to add the implied contract claim, and that the jury instructions therefore erroneously included an implied contract instruction. Because we hold, as a matter of public policy, that Gonsalves could not maintain a breach of implied contract claim, *see* discussion *infra*, we need not consider this argument.

17. The relevant portions are provided *infra*.

18. Recently, this court described the evolution and current status of the "at-will employment" doctrine in Hawai'i. *See Shoppe v. Gucci America, Inc.*, 94 Hawai'i 368, 14 P.3d 1049 (2000). The doctrine, developed in the mid-nineteenth

*at-will Doctrine: Have Its Exceptions Swallowed the Rule?*, 650 PLI/Lit 577, 619 (2001); *see also Davis v. Lumacorp, Inc.*, 992 F.Supp. 1250 (D.Kan.1998); *Vanderhoof v. Life Extension Institute*, 988 F.Supp. 507 (D.N.J.1997); *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712 (Ind.1997); *Phipps v. IASD Health Services Corp.*, 558 N.W.2d 198, 204 (Iowa 1997); *Bear v. Volunteers of America, Wyoming, Inc.*, 964 P.2d 1245 (Wyo.1998). Disclaimers do not *per se* preclude a claim for breach of an implied contract. The effectiveness of a disclaimer may be vitiated for a number of reasons, including disclaimers that: (1) are not clear, conspicuous, and understandable;[19] (2) contradict language in the manual;[20] or (3) contradict subsequent oral or written statements

century and was based on "notions of the freedom of contract and of the value of economic growth," recognizing an employer's right to discharge "for good cause, for no cause[,] or even for cause morally wrong." *Id.* at 382–83, 14 P.3d at 1063–64 (quoting *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 374–75, 652 P.2d 625, 628 (1982)) (internal quotation marks omitted). Yet, "[d]espite our reaffirmation of the at-will principle, we recognize that courts have decided that the previously unfettered right of employers to discharge employees 'can be contractually modified, and thus, qualified by statements contained in employee policy manuals or handbooks issued by employers to their employees.'" *Id.* at 383, 14 P.3d at 1064 (citing *Kinoshita v. Canadian Pacific Airlines, Ltd.*, 68 Haw. 594, 601, 724 P.2d 110, 115–16 (1986)).

**19.** *See Shoppe*, 94 Hawai'i at 385, 14 P.3d at 1066 (noting the "clear and unambiguous language" of the employee handbook); *Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845 (9th Cir.1990), *aff'g* 3 BNA IER CASES 619 (D.Haw.1988) (noting explicit disclaimer); *Eng v. Longs Drugs, Inc.*, 5 BNA IER CASES 342 (D.Haw.1990) (noting the express disclaimer on the inside of the back cover); *see also Orr*, 689 N.E.2d at 720 (requiring clear language and appropriate dissemination); *Phipps*, 558 N.W.2d at 204 (requiring disclaimer to be clear in its terms and unambiguous in its coverage); *Falco v. Community Med. Ctr.*, 296 N.J.Super. 298, 686 A.2d 1212, 1223 (1997) (stating that a clear and straightforward disclaimer, prominently and conspicuously displayed, may overcome the implication that an employment manual constitutes an enforceable employment contract); *Jose v. Norwest Bank*, 599 N.W.2d 293, 297 (N.D.1999) (noting that an explicit and conspicuous disclaimer demonstrates the employer's intent that the manual be merely a guide for the employee); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1088 (1984) (noting that specific and conspicuous statements can prevent an employer from being bound by statements in employment manuals); *Arch of Wyoming, Inc. v. Sisneros*, 971 P.2d 981, 984 (Wyo.1999) (requiring disclaimers to be conspicuous and unambiguous); *see also* George L. Blum, Annotation, *Effectiveness of Employer's Disclaimer of Representations in Personnel Manual or Employee Handbook Altering At-Will Employment Relationship*, 1994 WL 906421, 17 A.L.R.5th 1, 24–76 (1994 & Supp.2001).

**20.** *See Shoppe*, 94 Hawai'i at 385, 14 P.3d at 1066; *Calleon v. Miyagi*, 76 Hawai'i 310, 316, 876 P.2d 1278, 1284 (1994) (scrutinizing the language in the manual and observing that "there were very few specific procedures included in the manual; none specifically concerning employee termination"); *Kinoshita*, 68 Haw. at 603, 724 P.2d at 117 (explaining that the employer "attempted to [create an atmosphere of job security and fair treatment] with promises of specific treatment in specific situations"); *see also Ingels v. Thiokol Corp.*, 42 F.3d 616, 624 (10th Cir.1994) ("The alleged agreement must be read as a whole, so that any agreement terms are read in light of any disclaimers."); *Zaccardi v. Zale Corp.*, 856 F.2d 1473, 1476–77 (10th Cir. 1988) (stating that "[a] contractual disclaimer does not automatically negate a document's contractual status" and that the manual contained " 'specific contractual terms' that might evidence contractual intent"); *Aiello v. United Air Lines, Inc.*, 818 F.2d 1196, 1200 (5th Cir.1987) (considering the "detailed nature of the company regulations and the understanding that employees and supervisory personnel have with respect to them being part of a binding employment contract"); *Fletcher v. Wesley Medical Ctr.*, 585 F.Supp. 1260, 1264–65 (D.Kan.1984) (requiring handbook to be examined in its entirety and rejecting "notion that words an employer chooses to put in an employee handbook are legally insignificant sound and fury"); *Holland v. Union Oil Co. of California, Inc.*, 993 P.2d 1026, 1032 (Alaska 1999) (noting that "hedging terms," such as "can result" and "in most instances," may not create a reasonable expectation that employees have been granted certain rights, and, thus, may not form an implied contract); *Jones v. Central Peninsula General Hosp.*, 779 P.2d 783, 788 (Alaska 1989) (finding an implied contract because "manual created the impression, contrary to the disclaimer, that employees are to be provided with certain job protections"); *Orr*, 689 N.E.2d at 721 ("The Handbook's vague and general statements about [procedures] when weighed against the clear and specific language giving [employer] broad discretion in disciplinary matters and the prominent disclaimers, [do not create an implied contract]."); *Castiglione v. John Hopkins Hosp.*, 69 Md.App. 325, 517 A.2d 786, 793 (1986) ("The provisions for review,

by the employer.[21]

In *Shoppe*, this court addressed the effect of an express disclaimer in the context of a claim of implied contract. There, an at-will employee alleged that the employer's handbook constituted an "implied contract." The employer's handbook, however, "clearly stated that Plaintiff's employment was at-will and could be terminated at any time with or without notice." *Shoppe*, 94 Hawai'i at 385, 14 P.3d at 1066. The plaintiff admitted that she had been advised she was an at-will employee and that she understood she could be terminated at any time for no reason. *See id.* The plaintiff next argued that the employer "deviated from the termination procedures established in the employee handbook and that such a departure constituted a breach of implied contract." *Id.* However, the language of the handbook regarding oral and written warnings was not mandatory:

> Based upon this language, [the employer's] employee handbook does not require a

written warning before termination. The handbook provision makes it plain that termination is not predicated exclusively upon receipt of two or more written incident reports. An employee may be terminated without receiving a written report if, in the estimation her supervisor, "such discipline is warranted."

*Id.* In addition, the employee's supervisor had determined that termination was warranted. *See id.* at 385–86, 14 P.3d at 1066–67. Thus, this court concluded that the plaintiff could not maintain a breach of implied contract claim based on the handbook. *Id.* at 386, 14 P.3d at 1067.

■ In this case, Nissan's employee handbook does not unfairly induce an employee to rely on it. The first page is an "Employee Acknowledgment of Company Policies and Guidelines," which requires the employee's signature as acknowledgment of his or her at-will employment with Nissan:

> I hereby acknowledge that I have received a copy of the Policies and Guidelines Man-

---

when viewed in the larger context, were but 'general policy statements' not amounting to an offer of employment for a definite term or requiring cause for dismissal[.]"); *Falco*, 686 A.2d at 1225 (holding that the disclaimer, when read together with the disciplinary procedures, did not indicate creation of an implied contract); *Jose*, 599 N.W.2d at 297 (stating that in determining whether manual creates an implied contract, "the entire manual will be examined"); *Payne v. Sunnyside Community Hosp.*, 78 Wash. App. 34, 894 P.2d 1379, 1384 (1995) (finding that a disclaimer was "inconsistent with the Hospital's choice of terms in its progressive discipline policy" and "also inconsistent with another section of the manual which provides that the procedures are not subject to waiver or modification without the written consent of the chief executive officer"); *Alexander v. Phillips Oil Co.*, 707 P.2d 1385, 1388–89 (Wyo.1985) (finding that "except for the recitation ... that termination can be 'with or without cause,' the tenor of the ... handbook and of the Disciplinary Procedures Manual reflect necessity of cause for discharge").

21. *See Shoppe*, 94 Hawai'i at 385, 14 P.3d at 1066 ("[I]f an employer issues policy statements or rules, in a manual or *otherwise*, and, by its language or *by the employer's actions*, encourages reliance thereon, the employer cannot be free to selectively abide by it." (citing *Kinoshita*, 68 Haw. at 603, 724 P.2d at 117) (emphases added)); *Kinoshita*, 68 Haw. at 598–99, 603, 724

P.2d at 114, 117 (finding that an employer had "created a situation 'instinct with an obligation' " by distributing a letter, which informed the employees that "our written employment arrangements with you ... constitute[ ] an enforceable contract between us under [the] labor law of the state in which you work. Thus your rights in your employment arrangement are guaranteed"); *see also Courtney*, 899 F.2d at 850 (in concluding that no implied contract was created, the Ninth Circuit noted no "evidence to suggest that [the employer's] actions were not consistent with the disclaimer"); *Raymond v. International Bus. Mach. Corp.*, 148 F.3d 63, 67 (2d Cir.1998) (employer's officials had informed the employee of the company's policy to fire only for cause, and, thus, had formed an implied contract); *Reid v. Sears*, 790 F.2d 453, 456, 461 (6th Cir.1986) (analyzing "certain promises allegedly made"); *Elza v. Koch Indus., Inc.*, 16 F.Supp.2d 1334, 1345 (D.Kan.1998) (for totality of circumstances approach, "a disclaimer is not dispositive of whether an implied contract exists when the record contains statements from company personnel indicating a contrary intent"); *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880, 894 (1980) ("Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.' "); *Payne*, 894 P.2d at 1384 (employer acted inconsistently with the disclaimers by repeatedly insisting that the handbook "needed" to be followed).

ual for INFINITI–NISSAN MOTOR SALES ("Company"). I understand that the manual is merely a general overview of some of the Company's personnel policies and guidelines and that these policies and guidelines, as well as any other policies and guidelines which may be adopted by the Company, are subject to modification, discontinuation or change without notice by the officers of the Company.

It is further understood that the language contained in the Policies and Guidelines Manual is not intended to create a contract or agreement between the Company and the employee and that employment is for no fixed term and may be terminated, with or without cause or notice, at any time at the option of the Company or the employee. No person other than the General Manager has authority to enter into any written or oral employment contract or agreement.

*See Shoppe,* 94 Hawai'i at 385, 14 P.3d at 1066 (noting that plaintiff admitted that "she was advised and aware at the time of hiring that she was an at-will employee" and that she acknowledged and agreed in writing several times).

In addition to the acknowledgment form, Nissan reiterated, in the "Letter of Welcome," which immediately follows the table of contents, that the employment was at-will:

This Handbook has been prepared for your convenience. It contains general descriptions of some of our policies and procedures but it does not constitute an agreement or an employment contract. Management reserves the right to add to, alter and/or eliminate policies, benefits and procedures at any time without notice. Furthermore, no persons other than the General Manager have authority to enter into any written or oral employment contracts or agreements.

In the section addressing terminations and resignations, Nissan again explained the at-will employment:

Your employment with the Company is terminable at will. It may be terminated at any time, for any reason, at the discretion of management. Except in the case of termination for misconduct, management will make an effort to notify employees in writing of their termination in advance.

Similarly, you may elect to resign from the Company at your discretion. Employees are requested to give management the two (2) weeks' advance written notice of their intent to resign. Those employees who provide the Company with advance written notice will be paid for any unused vacation they accumulated as to the effective date of their resignation. No vacation pay will be given to employees who resign without adequate notice.

Next, the section of the manual pertaining to disciplinary procedures utilized general, optional language. The disciplinary procedures were qualified and specifically reserved to Nissan the "right to take whatever disciplinary measures it feels are appropriate, including discharge":

As an employee of this Company, you are required to abide by certain rules and regulations. These have been established to protect you, other employees and the Company from injury or other threats to your well-being and to promote harmonious, efficient working practices.

Failure to observe established rules and practices *can* lead to disciplinary action including formal warnings, suspension, probation and discharge.

The Company's *normal* practice is to help you identify problems and to improve your performance and behavior. The specific disciplinary action will *normally* be based on an assessment of the offense, the circumstances and your previous record. *The Company reserves the right to take whatever disciplinary measures it feels are appropriate, including discharge, if in the judgment of responsible supervisors and managers the employee's conduct cannot be corrected, or if it seriously threatens the well-being of the Company or other employees.*

(Emphases added.)[22] In contrast, we observe that the section concerning harassment and discrimination included mandatory language:

The Company is firmly committed to a policy of non-discrimination and the right of all employees to a work environment free of harassment and intimidation. Discrimination or harassment of any employee on the basis of race, color, age, sex, religion, national origin, disability status, marital status or arrest and court record *is prohibited.* Furthermore, unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature by any employee to any other employee are serious violations of the Company's policy against sexual harassment and *will not be tolerated.*

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors or physical conduct of a sexual nature under any of these conditions when:

-Submission to the conduct involves a condition of the individual's employment, either stated or implied;

-The individual's submission or refusal is used, or might be used, as the basis of an employment decision which affects the individual; or

-The conduct unreasonably interferes with the individual's job performance or creates a work environment that is intimidating, hostile or offensive.

All employees are responsible for compliance with this policy. Employees violating the policy against discrimination and harassment *will be subject to immediate and appropriate disciplinary action, including possible discharge.*

We request that any employee who feels he or she has been subjected to discrimina-

tion or harassment contact the General Manager immediately. *A confidential investigation will be conducted to resolve the matter promptly. Retaliation in any form against an individual who has filed a complaint of discrimination or harassment will not be tolerated.*

(Emphases added.)

Finally, as we have held *supra* in section IV.C, insofar as Suehisa's subsequent "promises" to Gonsalves undertook to ensure Gonsalves's continued employment despite the outcome of the company's investigation of Torres's sexual harassment complaint, they were unenforceable as against public policy; correlatively, they cannot be interpreted to contradict Nissan's disclaimer. Put differently, an interpretation by Gonsalves that would fundamentally alter the nature of his at-will employment on a basis offensive to public policy would be unreasonable.

Thus, we conclude that Nissan's disclaimer was valid. Under these circumstances, Nissan's handbook did not modify Nissan's right to discharge employees, nor give rise to the possibility of contractual recovery. Accordingly, with respect to Gonsalves's implied contract claim, the circuit court erred by denying Nissan's (1) motion for summary judgment, (2) two motions for judgment as a matter of law, and (3) renewed motion for judgment as a matter of law.

### E. *Defamation Based on Compelled Self-Publication*

■■■ Gonsalves contends that the circuit court erred in (1) granting Nissan's motion for judgment as a matter of law and (2) refusing his instruction, based on forced self-publication.[23] Gonsalves urges that this court adopt the theory of compelled self-publication.

---

**22.** Gonsalves also attempts to fashion an argument that uniform application of the policy by Nissan creates an implied contract. Coincidentally, as Gonsalves himself adduced examples of Nissan's inconsistent treatment of employees in his opening brief, this court need not address this issue.

**23.** Gonsalves proffered the following instruction on self publication:

*Self Publication.* One who communicates defamatory matter directly to the defamed person, who himself communicates it to a third party, has not published the matter to the third person if there are no other circumstances. If the circumstances indicated that communica-

This court has established the four elements necessary to sustain a claim for defamation:

(1) a false and defamatory statement concerning another;

(2) an unprivileged publication to a third party;

(3) fault amounting at least to negligence on the part of the publisher [actual malice where the plaintiff is a public figure]; and

(4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Gold v. Harrison,* 88 Hawai'i 94, 100, 962 P.2d 353, 359 (1998) (quoting *Dunlea v. Dappen,* 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original) (quotations omitted). In particular, it is an "elementary principle of tort law" that a defamation claim requires publication to a third party.

> The interest which is here protected is of that reputation, and for tort liability to lie for either slander or libel the defamation must be communicated to some third party other than the person defamed.

*Runnels v. Okamoto,* 56 Haw. 1, 3, 525 P.2d 1125, 1127 (1974). This court has not addressed the issue of whether self-publication of the reason for termination by a former employer to prospective employers satisfies this publication requirement.

Generally, "where a person communicates defamatory statements only to the person defamed, who then repeats the statements to others, the publication of the statements by the person defamed will not support a defamation action against the originator of the statements." David P. Chapus, Annotation, *Publication of Allegedly Defamatory Matter by Plaintiff ("Self–Publication") as Sufficient to Support Defamation Action,* 62 A.L.R.4th 616, 622–25 (1988) (survey of cases nationwide).

> tion to a third party is likely, however, a publication may properly be held to have occurred. Restatement (Second) of Torts § 577; *First*

A minority of the states have created an exception to this general rule where "the plaintiff is effectively compelled to publish the defamatory material to prospective employers." *Sullivan v. Baptist Mem'l Hosp.,* 995 S.W.2d 569, 573 (Tenn.1999). The Court of Appeal of California explained the reason for recognizing an exception:

> The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication. This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed.

*McKinney v. County of Santa Clara,* 110 Cal.App.3d 787, 797–98, 168 Cal.Rptr. 89 (1980), *quoted in Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1344 (Colo.1988); *Lewis v. Equitable Life Assurance Soc'y of the United States,* 389 N.W.2d 876, 887 (Minn. 1986). Thus, some courts have held that, "in an action for defamation, the publication requirement may be satisfied where the plaintiff was compelled to publish a defamatory statement to a third person if it was foreseeable to the defendant that the plaintiff would be so compelled." *Lewis,* 389 N.W.2d at 888; *see also McKinney,* 110 Cal.App.3d at 797–98, 168 Cal.Rptr. 89; *Churchey,* 759 P.2d at 1345; *Neighbors v. Kirksville College of Osteopathic Medicine,* 694 S.W.2d 822, 825 (Mo. Ct.App.1985); *First State Bank of Corpus Christi v. Ake,* 606 S.W.2d 696, 701 (Tex.App. 1980).

Nevertheless, the "majority of states addressing the issue do not recognize self-publication as constituting publication for defamation purposes, even when the publication is compelled in the employment setting." *Sul-*

> *State Bank of Corpus Christi v. Ake,* 606 S.W.2d 696 (1980)[.]

livan, 995 S.W.2d at 573 (citing *Gore v. Health–Tex, Inc.,* 567 So.2d 1307 (Ala.1990)); *see also Layne v. Builders Plumbing Supply Co.,* 210 Ill.App.3d 966, 155 Ill.Dec. 493, 569 N.E.2d 1104 (1991); *Parsons v. Gulf & South American Steamship Co.,* 194 So.2d 456 (La. Ct.App.1967); *Wieder v. Chemical Bank,* 202 A.D.2d 168, 608 N.Y.S.2d 195 (1994); *Yetter v. Ward Trucking Corp.,* 401 Pa.Super. 467, 585 A.2d 1022 (1991); *Lunz v. Neuman,* 48 Wash.2d 26, 290 P.2d 697 (1955). In addition, many federal courts applying state law have recognized the majority rule. *See, e.g., De Leon v. Saint Joseph Hosp., Inc.,* 871 F.2d 1229, 1237 (4th Cir.1989); *Spratt v. Northern Automotive Corp.,* 958 F.Supp. 456, 465 (D.Ariz.1996); *Sarratore v. Longview Van Corp.,* 666 F.Supp. 1257, 1263 (N.D.Ind. 1987); *Hensley v. Armstrong World Indus., Inc.,* 798 F.Supp. 653, 657 (W.D.Okla.1992).

In *Sullivan,* the Supreme Court of Tennessee cited several policy reasons for rejecting the doctrine of compelled self-publication. *Sullivan,* 995 S.W.2d at 573. First, allowing a defamation claim in such context would interfere with employers', employees', and the public's interest in "open communication about job-related problems." *Id.* (quoting *Layne,* 155 Ill.Dec. 493, 569 N.E.2d at 1111 (citation omitted)). "[T]he potential for defamation liability every time an employee is terminated would chill communications in the work place, preventing employers from disclosing reasons for their business decisions, and would negatively affect grievance procedures intended to benefit the discharged employee." *Id.* More specifically,

[a] shutdown of communication would hurt both employees and employers. Employees falsely accused of misconduct may be wrongfully terminated because they would never have a chance to rebut the false accusations. Employees who may be able to improve substandard job performances may fail to do so because needed feedback is withheld.... It seems that both employees and employers stand to lose if employers adopt a policy of silence.... Unfortunately, employees will bear the costs of such a policy without a corresponding benefit.

*Id.* at 574 (quoting Louis B. Eble, *Self–Publication Defamation: Employee Right or Employee Burden?,* 47 Baylor L.Rev. 745, 779–80 (1995)). Indeed, accepting the compelled self-publication doctrine may actually harm employees who have been fired for discriminatory reasons:

Normally, a factfinder would be justifiably suspicious if an employer fired an employee in a protected group and refused to explain the reason for the termination at the time of discharge. In light of the self-publication doctrine, however, an employer's silence could justifiably be viewed as savvy rather than suspicious.

*Id.* (quotation, citations, and internal quotation marks omitted).

Second, plaintiffs would have a perverse incentive to not mitigate damages. *See id.* (citing *Layne,* 155 Ill.Dec. 493, 569 N.E.2d at 1111). Because (1) the statute of limitations in a defamation case starts to run from the date of publication, and (2) a new cause of action arises with each publication, a plaintiff "would not only have the ability to control the statute of limitations but also the number of causes of action which arise." *Id.* In other words, a plaintiff need only apply for a job and give the former employer's reason for termination to have a cause of action. Thus, a defendant employer could be subject to liability throughout the plaintiff's lifetime.

Third, the theory of compelled self-publication conflicts with the employee-at-will doctrine. *See id.* Under the at-will employment doctrine, an employer may terminate an at-will employee "at any time for good cause, bad cause, or no cause." *Id.* (citation omitted). "To adopt the doctrine of compelled self-publication and to impose a duty on employers to conduct a thorough investigation leading to accurate conclusions would significantly compromise these well-settled principles encompassed by the at-will employment doctrine[.]" *Id.* (citations omitted); *cf.* discussion *supra* IV.C.

Finally, the court recognized that the Tennessee legislature had already "spoken on

the issue of the employer's liability incurred from communicating information about the employee." *Id.* at 574, 155 Ill.Dec. 493, 569 N.E.2d 1104. The court stated:

> Under [Tenn.Code Ann. § 50–1–105 (Supp. 1998)], mere negligence is not enough to rebut the presumption in favor of the employer's good faith. In contrast, defamation may be proven by establishing that a party published a false and defaming statement with reckless disregard for the truth or with negligence in failing to ascertain the truth. Thus, under the statute, an employer could not be held liable for disclosing allegedly defamatory information about which it was only negligent in ascertaining the truth. It follows, therefore, that an employer should not be held liable for disclosure of this same information when it is self-published by a former employee.

*Id.* (citation omitted). We observe that the Hawaiʻi legislature has likewise prescribed that an "employer that provides to a prospective employer information or opinion about a current or former employee's job performance is presumed to be acting in good faith and shall have a qualified immunity from civil liability for disclosing the information and for the consequences of the disclosure." HRS § 663–1.95(a) (Supp.1998).

 We note that another argument against recognizing the compelled self-publication theory in this context is that "[t]ruth is an absolute defense" to defamation. *See Hensley,* 798 F.Supp. at 657 (citations omitted). Thus, an employer's statement that the employee was terminated for a *perceived* reason would be truthful, regardless of whether the reason itself was accurate. *See id. But see Lewis,* 389 N.W.2d at 889 ("Requiring that truth as a defense go to the underlying

implication of the statement, at least where the statement involves more than a simple allegation, appears to be the better view.") (citation omitted).

We adopt the majority rule of rejecting the theory of compelled self-publication. Accordingly, the circuit court did not err in (1) dismissing Gonsalves's claim for defamation and (2) refusing Gonsalves's instruction based on compelled self-publication.

### F. *Sanctions*

#### 1. *Discovery sanctions*

 Gonsalves argues that the circuit court erred in granting Nissan sanctions against Gonsalves.[24] Recently, in *Fujimoto v. Au,* 95 Hawaiʻi 116, 153, 19 P.3d 699, 736 (2001), this court explained that in the context of HRCP Rule 11 sanctions, a "showing of 'bad faith' is not required where the conduct of counsel is at issue. Rather, an objective standard, focusing on what a reasonably competent attorney would believe, is the proper test." *Id.* (citations and internal quotation signals omitted).

Here, as described in Nissan's motion for sanctions[25] on August 24, 1999, the circuit court denied Gonsalves's request to redepose Suehisa. The court informed Gonsalves's counsel, "[F]or you to ask to depose him again under these circumstances seems unwarranted." The court, however, observed that if "the documents which are [later] produced call for a redeposition of Mr. Suehisa," then that could be arranged. On August 27, 1999, Gonsalves filed a notice of Suehisa's deposition. At the hearing, after Nissan pointed out that no subsequently produced documents required a redeposition the court reprimanded Gonsalves's counsel:

> Well, I know from Mr. Suehisa this, Mr. Hiatt, you have noticed his deposition be-

---

24. At a September 7, 1999 hearing, the court awarded sanctions of reasonable attorneys' fees and costs because Gonsalves had "noticed [Suehisa's] deposition before [the court had] ruled on issues which [Gonsalves had] raised in another motion concerning his redeposition." On December 10, 1999, the court determined that Gonsalves should be sanctioned in the amount of $5,000.

25. HRCP Rule 11(c)(1)(A) actually states that a "motion for sanctions under this rule shall be made separately from other motions or requests." Here, however, Nissan combined its motion for sanctions with a motion for protective order and motion for shortened time.

fore I have ruled on issues which you have raised in another motion concerning his redeposition, and quite frankly I find that inappropriate. I think you ought to wait until I make a ruling or—and then you can notice his deposition, but now you're asking me to allow it, to some extent to allow his deposition and run back and look at his—at your motion, which isn't even before me yet, and I—I don't think that that is a proper practice.

Given these circumstances, the circuit court did not abuse its discretion in sanctioning Gonsalves's counsel.

■ Gonsalves also contends that the $5,000 in fees awarded is excessive and unreasonable. The circuit court made its decision after reviewing four filings by both parties, including Nissan's claimed fees of $11,695.08, which detailed the description of the time spent. There is nothing in the record to indicate that the circuit court "exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Gold v. Harrison*, 962 P.2d 353, 359, 88 Hawaiʻi 94, 100 (1998) (citing *State ex rel. Bronster v. United States Steel Corp.*, 82 Hawaiʻi 32, 54, 919 P.2d 294, 316 (1996)). Accordingly, the circuit court did not abuse its discretion in imposing the $5,000 attorneys' fees and costs sanction.

### 2. *Post-trial sanctions*

■ Gonsalves's final issue on appeal is whether the circuit court erred by denying his motion for HRCP Rule 11 sanctions based on Nissan's (1) violation of a pretrial

order and (2) false claims of privilege and relevance.[26]

■ HRCP Rule 11 provides that "[i]f, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." Thus, the circuit court has the discretion to determine whether the imposition of monetary sanctions is appropriate. *See Fujimoto*, 95 Hawaiʻi at 137, 19 P.3d at 720.

In the present case, the circuit court examined Nissan's counsel's conduct at issue and found that, although it was questionable, it did not rise to the level of being sanctionable. With respect to a report Nissan improperly claimed as irrelevant and privileged, the court stated:

> ... I think that counsel certainly needs to be cautioned here that if you didn't cross the line, you were certainly tiptoeing on it and you have to be careful and you should not be playing fast and loose to gain a strategic advantage and I think it came very, very close to crossing that line.

With respect to Nissan's effort to introduce evidence without notice and contrary to a pretrial order, the court explained:

> In terms of the court's pre-trial order regarding the dress, I think I've already made the finding regarding a violation of that order and so the real issue then comes to sanctions....

**26.** On May 1, 2000, the court denied Gonsalves's motion for sanctions. Gonsalves's appeal from the order denying sanctions against Nissan's counsel is properly before this court. Rule 4(a)(3) provides:

> **Time to Appeal Affected by Post–Judgment Motions.** If, not later than 10 days after entry of judgment, any party files a motion that seeks to reconsider, vacate, or alter the judgment, or seeks attorney's fees or costs, the time for filing the notice of appeal is extended until 30 days after entry of an order disposing of the motion; provided, that the failure to dispose of any

> motion by order entered upon the record within 90 days after the date the motion was filed shall constitute a denial of the motion.
> The notice of appeal shall be deemed to appeal disposition of all post-judgment motions that are filed within 10 days after entry of judgment.
> The 90–day period shall be computed as provided in Rule 26.

Gonsalves's motion was filed on February 28, 2000, which was before notice of entry of judgment was filed on April 4, 2000.

.... So it really comes down to the pre-trial order and sanctions and whether they should issue or not. Again, Miss Evans, I think the matter with the pre-trial order and dress, you are a zealous advocate for your clients. No one's going to argue with that.

And the question is, how far is that zealousness permitted to go? And at the same time, in settling jury instructions, in conversing with you off the record about a number of things, you're a nice person. I have no animus personally or anything like that, but you are very zealous when you defend your clients, as well you should be.

And the real question is, where is the line? Where are you going to draw it? Are you going to step back from the line or are you going to go up to, on, dip your toe over the line. And I think you have—with the pre-trial order, I think you crossed the line. . . .

You were tiptoeing on that line. That's the benefit of the doubt. Am I going to sanction you for it? It's discretionary with the court and no, I'm not. You're cautioned. You're admonished. You can be zealous and you can be straight up and be zealous at the same time. You don't have [to] cross that line. You don't have to tiptoe on it and I think those comments of mine are sanction enough and I'm not going to impose any monetary sanction.

There is nothing in the record to indicate that the circuit court "exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Gold*, 962 P.2d at 359, 88 Hawai'i at 100 (citing *Bronster*, 82 Hawai'i at 54, 919 P.2d 294 at 316).

Accordingly, the circuit court did not abuse its discretion in declining to impose a monetary sanction. *See Fujimoto*, 95 Hawai'i at

153, 19 P.3d at 736 ("For purposes of appellate review, a distinction must be made between zealous advocacy and plain pettifoggery.").

## V. CONCLUSION

Because Gonsalves is unable to establish and maintain his sex discrimination, implied contract, and promissory estoppel claims, we remand for entry of a judgment in favor of Nissan with respect to the discrimination, promissory estoppel, and implied contract claims. Gonsalves's claims raised on appeal are without merit.

Opinion of ACOBA, J.

## CONCURRING IN PART AND DISSENTING IN PART

In the main,[1] I respectfully disagree with the majority's promissory estoppel analysis for the reasons following. First, I believe the "manifestation of [Defendants'] intent" in the promises made by them to Gonsalves must be viewed using an objective standard. Hence, the statements only, rather than an interpretation of the subjective intent of Wayne Suehisa, the Vice President and Treasurer of Nissan and the Treasurer of Infiniti, in making the statements, are controlling. Ordinarily, the nature of the promises, and whether those statements were sufficient to create an enforceable promise, are questions for the jury.

I believe that the jury could have determined that one of the statements made by Suehisa was sufficiently definite so as to justify Gonsalves in understanding that a binding promise had been made. However, inasmuch as only one of the several "promises" submitted by the court to the jury would support a promissory estoppel claim, I

---

1. I also believe the court abused its discretion in failing to sanction Defendants–Appellants/Cross–Appellees Nissan Motor Corporation in Hawai'i, Ltd. and Infiniti Motor Sales, Inc. (collectively, Defendants) for violation of a pretrial order and "*false* claims of privilege and relevance." Majority opinion at 43 (emphasis added). I believe

these violations were more egregious than the unauthorized setting of a deposition for which the Plaintiff–Appellee/Cross–Appellant Leland Gonsalves was sanctioned by the court and which the majority upholds. I agree with the majority's resolution of Gonsalves's sex discrimination and implied contract claims.

would remand the case for the jury to consider whether that promise supported Defendants' liability and if the jury affirmatively decided it did, then for the jury to apply a "reliance" measure of damages rather than "expectation" damages as it had been instructed. Second, in my view, public policy, which the majority relies on, does not mandate that we refuse to enforce Suehisa's promises to Gonsalves, inasmuch as other methods of progressive discipline were available to the employer to meet public policy concerns.

## I.

According to the promissory estoppel instruction given by the court, Suehisa made four representations to Gonsalves: (1) that Gonsalves did not need an attorney; (2) that Gonsalves would not be fired; (3) that the investigation would be "thorough and fair"; and (4) that Gonsalves would be provided with progressive discipline in a "fair and consistent" manner.[2]

Defendants contend that Gonsalves's promissory estoppel claim "fails as a matter of law" because the statements made by Suehisa "do not express a clear and definite commitment or intention to act or refrain from acting in any specified way." (Quoting *In re Herrick*, 82 Hawai'i 329, 338, 922 P.2d 942, 951 (1996).) Defendants maintain that (1) the first statement reflects an opinion or an assurance, rather than a promise, (2) the second statement was a warning made to Neldine Torres and was not a commitment to Gonsalves, and (3) the third statement is vague and, therefore, fails to provide a clear and definite promise. In my view, Defendants are arguably correct regarding the first and third promises, but not the second.

## II.

The question of whether an enforceable promise has been made is determined on a case-by-case basis. As one court has observed, "as to establishing the requisite

promise, the totality of the circumstances determines the nature of the contract. Agreement may be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances." *Price v. Public Serv. Co.*, 1 F.Supp.2d 1216, 1226 (D.Colo. 1998) (quoting *Soderlun v. Public Serv. Co.*, 944 P.2d 616, 621 (Colo.Ct.App.1997)).

Not all statements are enforceable "promises." A promise to act is distinguishable from an opinion or a prediction.

A promise must be distinguished from a statement of opinion or a mere prediction of future events. *The distinction is not usually difficult in the case of an informal gratuitous opinion, since there is often no manifestation of intention to act or refrain from action or to bring about a result, no expectation of performance and no consideration.*

Restatement (Second) of Contracts § 2 cmt. f (1979). Moreover, a promise must be somewhat definite in order to allow the court to evaluate the promise and its attendant obligations. *See Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1465 (10th Cir.1994) (assurances of fair treatment were mere "vague assurances" and unenforceable under Colorado law); *Grossman v. Computer Curriculum Corp.*, 131 F.Supp.2d 299, 306 n. 4 (D.Conn.2000) (assurances of continued employment, allegedly given to employee educational consultant by officer of employer in successful effort to dissuade him from resigning, were insufficiently detailed to constitute promise); *Irwin v. Marquette Med. Sys., Inc.*, 107 F.Supp.2d 974, 990–91 (S.D.Ohio 2000) (e-mail message from executive to sales persons, informing them that strategic alliance with another company did not place anyone's job in jeopardy, did not constitute promise of continued employment); *Wilder v. Butler Mfg. Co.*, 178 Ill.App.3d 819, 128 Ill. Dec. 41, 533 N.E.2d 1129, 1130–31 (1989) (concluding that statements by personnel manager to employee that "[you're] the first woman here[;][t]here's no problem[;][y]ou

**2.** Neither party mentions the fourth alleged promise in their briefs.

have a permanent job," did not state clear and definite terms of an enforceable contract); *Titchener v. Avery Coonley Sch.,* 39 Ill.App.3d 871, 350 N.E.2d 502, 506–07 (1976) (holding that statement by employer that "[y]our future is here at [the school,] and I hope it will be for many years to come" did not state clear and definite terms of an enforceable contract).

### III.

### A.

Suehisa's first statement to Gonsalves, that Gonsalves did not need an attorney, was seemingly an opinion or an assurance, rather than "a manifestation of intention to act or refrain from acting in a specified way[.]" *Herrick,* 82 Hawai'i at 338, 922 P.2d at 951 (quoting Restatement (Second) of Contracts, *supra,* § 2(1)). Accordingly, it was not an enforceable promise.

Suehisa's third statement to Gonsalves, that the investigation would be "thorough and fair," does indicate an "intention to act . . . in a specified way[.]" *Id.* This statement was, however, insufficiently definite to enable this court to evaluate the promise and its attendant obligations. Similarly, the fourth alleged promise that Gonsalves would be provided with progressive discipline in a "fair and consistent" manner is also insufficiently definite to constitute terms of an enforceable contract.

The statement that Gonsalves testified Suehisa made to him, that Gonsalves "didn't have to worry about losing [his] job[,]" must be viewed objectively. It cannot be construed in terms of any hypothetical or unvoiced intentions Suehisa may have harbored when making the remark. Suehisa promised Gonsalves that he would not lose his job. Although the promise was made to Gonsalves before the completion of the investigation, there is no indication that it was contingent upon the results of that investigation. By contracting the meaning behind the statement that "Gonsalves didn't have to worry about losing [his] job" to Gonsalves could be

discharged pending the outcome of the investigation, Defendants substitute their view of Suehisa's supposed subjective intent as to what Suehisa was trying to convey. Defendants err in doing so, inasmuch as a promise must be viewed objectively, rather than as incorporating limitations based upon the secret intentions of the promisor. In effect, Defendants redefine the word "promise."

### B.

In *Ravelo v. County of Hawaii,* 66 Haw. 194, 658 P.2d 883 (1983), this court adopted the revised Restatement (Second) of Contracts § 90 (1979), which sets out the requirements of promissory estoppel. *See Ravelo,* 66 Haw. at 201, 658 P.2d at 887–88. "[T]he essence of [promissory estoppel] is detrimental reliance on a promise." *Id.* at 199, 658 P.2d at 887 (citations omitted). The elements of promissory estoppel pursuant to § 90 are:

(1) There must be a *promise;*

(2) The promisor must, at the time he or she made the promise, foresee that the promisee would rely upon the promise (*forseeability* );

(3) The promisee does in fact *rely* upon the promisor's promise; and

(4) Enforcement of the promise is necessary to avoid *injustice.*

*Herrick,* 82 Hawai'i at 337–38, 922 P.2d at 950–51 (citation omitted) (emphases in original). In *Herrick,* this court further defined a promise as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Id.* at 338, 922 P.2d at 951 (quoting Restatement (Second) of Contracts, *supra,* § 2(1)). "In elaborating on this term, the commentators have said that '[a] promisor manifests an intention if he [or she] believes or has reason to believe that the promisee will infer that intention from his [or her] words or conduct." *Id.* (quoting Restatement (Second) of Contracts, *supra,* § 2(1) cmt. b).

The promisor's manifestation, and, therefore, the promisor's promise, is judged using

an objective standard, rather than relying upon only what the promisor *intended* to convey. Restatement (Second) of Contracts § 2 comment b explains that "[t]he phrase 'manifestation of intention' adopts an external or *objective standard* for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention." (Emphasis added.)

Viewed objectively, Suehisa's statement that Gonsalves "didn't have to worry about losing his job" is unconditional. The plain meaning of Suehisa's statement was that Gonsalves did not have to worry about termination, not that Gonsalves's job was safe only for the time being, or that Suehisa would not fire Gonsalves at that point in time, based solely on Torres's uninvestigated allegations. There is nothing within the promise itself that conditions Gonsalves's job. Accordingly, the promise must be judged on the *"external* expression of intention[.]*"* Restatement (Second) of Contracts, *supra,* § 2 cmt. b (emphasis added).

## IV.

In the present case, the jury determined that, through their agent Suehisa, that Defendants had made enforceable representations to Gonsalves. It is well established in this jurisdiction that, in contract, "[w]hether or not the parties entered into an agreement is essentially a question of fact." *Island Directory Co. v. Iva's Kinimaka Enters., Inc.,* 10 Haw.App. 15, 23, 859 P.2d 935, 940 (1993) (citations omitted). As such, the existence of a contractual relationship is a question for the jury "for its determination of the facts concerning the issue of the contractual relation between the parties." *Ferreira v. Honolulu Star–Bulletin,* 44 Haw. 567, 571,

356 P.2d 651, 654, *reh'g denied,* 44 Haw. 581, 357 P.2d 112 (1960). Similarly, "[i]f the evidence as to whether an enforceable promise was made is 'conflicting or will admit of more than one inference[,] . . . the issue is one for the jury. If, on the other hand, the evidence discloses only a "vague assurance," rather than a legally enforceable promise, then the court must determine the issue as a matter of law.'" *Price,* 1 F.Supp.2d at 1226 (quoting *Soderlun,* 944 P.2d at 621).

Because all of the "promises" were presented as a package in one instruction [3] to the jury for its consideration, the jury could have relied on one of the statements that did not amount to an enforceable promise.[4] The instruction therefore was erroneous, and I would vacate the judgment and remand for the jury's consideration of Defendants' statement that Gonsalves would not lose his job.

## V.

Defendants argue that Gonsalves also may not maintain his promissory estoppel claim because Gonsalves cannot prove damages. They urge that the jury instructions regarding damages on Gonsalves's promissory estoppel claim allowed the jury to award "improper contract damages" contrary to Hawai'i case law. In opposition, Gonsalves maintains that the amount of damages for all claims was "conservative." As to the jury instructions, Gonsalves argues that these were proper and not in any way misleading.

## A.

The doctrine of promissory estoppel may modify an employment relationship that is otherwise terminable at will. *See, e.g., Lord*

---

3. The record indicates that an objection was made to the jury instruction, however, the nature of the objection is unclear.

4. The subject instruction stated that
 [t]o prevail under this theory, Plaintiff must prove each of the following elements by a preponderance of the evidence:
 First, that Defendants made the following promises to Plaintiff concerning his employ-

ment with Defendants: a) that he would be provided a thorough and fair investigation of the claims against him by Neldine Torres; b) that he would not lose his position; c) that he did not need to obtain a lawyer and; and [sic] d) that he would be provided with progressive discipline in a fair and consistent manner.

*v. Souder,* 748 A.2d 393, 399 (Del.2000); *Foote v. Simmonds Precision Prods. Co.,* 158 Vt. 566, 613 A.2d 1277, 1278 (1992). A promise can be made during the course of employment that does not specifically change the at-will relationship and does not remove the employment relationship from the at-will realm. *See id.* at 1280. Thus, a promise may modify the terms of the relationship, so as to prevent an employer from terminating an employee for a specific reason, while otherwise generally retaining the at-will character of the relationship, allowing the employer to discharge the employee for any or no reason, except for the specific situation that is the subject of the modification. *See id.*

> Nothing about the at-will doctrine suggests that it does not coexist with numerous modifications and exceptions imposed by law, including the law of promissory estoppel, depending on the facts of a particular case.... Even with modifications, employees for an indefinite term are still considered at-will employees, who may be discharged for any number of reasons not prohibited by the modifications.

*Id.*

## B.

Calculating damages in cases such as these, however, is a different matter than determining damages in an ordinary contract situation. Damages cannot be predicated on future earnings, because the employee generally can still be terminated for any or no reason at all. *See Treadwell v. John Hancock Mut. Life Ins. Co.,* 666 F.Supp. 278, 287 (D.Mass.1987) (stating that, because "[t]he promise of secure and continued employment is simply too vague to be enforceable under the doctrine of promissory estoppel and thereby transform the nature of plaintiff's employment from at-will to employment for a definite period[,]" "plaintiff cannot recover as damages wages or benefits related to future services beyond that which would accrue during the period covered by" the retraining program promised to the plaintiff). Damages may still be established by the employee, in the form of financial detriment incurred as a result of the termination, however. *See Lord,* 748 A.2d at 400 ("Although quantifying damages in cases involving the wrongful discharge of an at-will employee is problematic, ... [i]t is sufficient to claim that the discharge would not have otherwise occurred when it did and that the plaintiff incurred financial detriment as a result.").

## VI.

The foregoing is consistent with our case law. Such a limitation on recovery is envisioned by the revised Restatement (Second) of Contracts, *supra,* § 90, which was adopted by this court in *Ravelo, see* 66 Haw. at 201, 658 P.2d at 887–88. Prior to *Ravelo,* this jurisdiction had viewed promissory estoppel under Restatement of Contracts § 90 (1932), which had required "action or forbearance of a definite and substantial character." *Id.* at 200, 658 P.2d at 887 (quoting Restatement of Contracts § 90 (1932)). As noted by the *Ravelo* court, "[c]hanges from the former § 90 are reflected in the deletion of the requirement that the action or forbearance induced be of 'a definite and substantial character,' ... and a recognition of the possibility of partial enforcement." *Id.*

In *Ravelo,* this court additionally declared that partial enforcement was "particularly apt in this situation." *Id.* at 201 n. 4, 658 P.2d at 888 n. 4. This court explained that "relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise. Unless there is unjust enrichment of the promisor, damages should not put the promisee in a better position than performance of the promise would have put him[ or her]." *Id.* (citations omitted).

As noted *supra,* because Gonsalves could generally be fired for any or no reason at all, any recovery for future earnings or benefits would "put [Gonsalves] in a better position than performance of the promise would have put him." *Id.* (citations omitted). Thus, as in *Ravelo,* Gonsalves was limited to partial

performance of Suehisa's promise. Accordingly, damages in the present case should have been limited to those damages "measured by the extent of [Gonsalves's] reliance[,]" *id., i.e.,* reliance damages, "rather than by the terms of the promise[,]" *id., i.e.,* expectation damages. Accordingly, Gonsalves could not recover damages in excess of the earnings he would have realized had Defendants kept their promise and not terminated him based upon the allegations of harassment.

## VII.

Defendants rely upon the "after-acquired evidence" rule set forth in *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 359, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). They contend that Gonsalves's damages "would end (under the 'after-acquired evidence doctrine') when Defendants decided to terminate [Gonsalves] as a result of [their independent investigator, Linda] Kreis's report[,]" because, even if the original termination of Gonsalves was discriminatory, Kreis's report was sufficient to allow Defendants to terminate Gonsalves anyway. Gonsalves, on the other hand, argues that the "after-acquired evidence" rule has never been adopted in Hawai'i and is based upon a federal law, the Age Discrimination in Employment Act, § 2 et seq., 4(a)(1), as amended, 29 U.S.C.A. § 621 et seq., 623(a)(1) (1967). Further, Gonsalves argues that, even under *McKennon*, Defendants must establish that "the wrongdoing [constituting the reason for the second discharge] was of such severity that the employee would, in fact, have been terminated on those grounds alone had the employer known of it at the time of the discharge."

As observed by the majority, Gonsalves has no sex discrimination claim as a matter of law, and there was no implied contract that would alter the at-will nature of his employment. Thus, Defendants did not require a reason to terminate Gonsalves. Ac-

cordingly, the after-acquired doctrine is, in the present case, irrelevant to the question of damages.

## VIII.

The jury instruction in the present case, however, did not address reliance damages but, instead, suggested expectation damages, in contravention of *Ravelo*. It stated as follows:

> If you find for the Plaintiff under his theory of promissory estoppel, you may award such damages, if any, *as would put the Plaintiff in the same position he would have been in if the promises allegedly made to him by Defendants had been kept.*

(Emphasis added.) The wording of the instruction did not limit Gonsalves's award under his promissory estoppel claim to any detriment he suffered in reliance on the promises, nor indicate that Gonsalves could not recover more than he would be entitled to had the Defendants' promises been kept.

Instead, the instruction appears to rely upon the results of the other claims, inasmuch as the amount awarded "as would put [Gonsalves] in the same position he would have been in if the promises allegedly made to him by Defendants had been kept" rests upon a determination of future damages: if the jury determined that there was an implied contract and that Gonsalves was not an at-will employee, a promise not to fire Gonsalves could include future earnings. Thus, Gonsalves could receive expectation damages, rather than reliance damages.

This is demonstrated by the jury's verdict. The special verdict form with respect to promissory estoppel indicated that the jury found that "[Defendants] breach[ed] a promise to Mr. Gonsalves, upon which Mr. Gonsalves relied[.]" The jury indicated that special damages regarding this claim were $1,090,597, and general damages were $140,000.[5] The jury, however, returned verdicts for the same amount of special damages

---

**5.** The jury separately awarded the amount of $1,090,597 as special damages for Gonsalves's

discrimination claim, promissory estoppel claim, and implied contract claim. Prior to reaching a

for the discrimination and implied contract claims.

Additionally, the instruction did not limit any damages awarded to not more than what Gonsalves would have received, had Defendants kept their promises. Because the instruction did not differentiate between results, if the jury determined that Gonsalves was an at-will employee and if he was not, Gonsalves could receive an award in excess of what he could have received as future earnings and benefits had he remained in the employment of Defendants.

It is well established that erroneous jury instructions are presumptively harmful:

> "When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *Hirahara v. Tanaka*, 87 Hawai'i 460, 462, 959 P.2d 830, 832, *reconsideration denied*, 87 Hawai'i 460, 959 P.2d 830 (1998) (citing *Craft v. Peebles*, 78 Hawai'i 287, 302, 893 P.2d 138, 153 (1995)). "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Id.* at 463, 959 P.2d at 833 (citing *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997)).

*Nelson v. University of Hawaii*, 97 Hawai'i 376, 386, 38 P.3d 95, 105 (2001). The jury instruction regarding damages, here, was also erroneous, because the limitations established by *Ravelo* were not included therein. Therefore, I would remand this case on the issue of damages also.

### IX.

The majority further objects to the enforcement of Suehisa's promises because it

maintains that "this court [should not] enforce promises ... against public policy." Majority opinion at 165, 58 P.3d at 1212. Contrary to the majority's assertion, however, there is no public policy that mandates that an employer terminate an employee who is accused of sexual harassment, and, accordingly, public policy does not require that this court invalidate any promises not to terminate such an employee, inasmuch as other forms of discipline are available to cure any violations.[6]

In its amicus curiae brief, the HCRC argues that the promises made by Suehisa should not be enforceable as a matter of public policy. As explained by the HCRC, within the context of supervisor harassment, absolute liability on the employer is imposed, but "immediate and appropriate action is still required ... to 'take any other steps necessary to prevent sexual harassment.'" (Quoting Hawai'i Administrative Rules (HAR) Rule § 12–46–109(d).) Therefore, according to the HCRC, "[t]o the extent that these promises constitute a disavowal of an employer's legal obligation to take immediate and appropriate corrective action to prevent sexual harassment, they must be treated as unenforceable as a matter of public policy." (Citing *In re Doe*, 90 Hawai'i 200, 978 P.2d 166 (App.1999).)

As observed by the HCRC, however, "the rule on supervisor harassment ... does not specify what an employer must do after notice" of supervisor harassment. In the present case, Suehisa promised Gonsalves that he would not be fired. Suehisa did not make any representations as to other disciplinary actions that may have been "immediate and appropriate[ly] corrective[.]" HAR Rule § 12–46–109(d). Other disciplinary methods were available and were, in fact, recommended by Kreis in her interim report. In that report, she recommended that Gonsalves

---

verdict, the jury had sent a communication, asking if the damages for each cause were cumulative. The court had answered that "[t]he damages calculated under each count should be made separately. The [c]ourt will ensure that Mr. Gonsalves does not receive a double recovery."

6. While the fourth alleged promise was not an enforceable promise, the option was open for the employer to impose progressive discipline, as it had seemingly indicated and as had been recommended by Kreis.

"be counseled about his unacceptable behavior and disciplined in a manner to assure that there's no reoccurence." Thus, under the circumstances of this case, enforcement of the promises made to Gonsalves would not "constitute a disavowal of [Defendant's] legal obligations" or a violation of public policy.

## X.

Accordingly, based upon the analysis *supra*, I would remand this case to the court on Gonsalves's promissory estoppel claim.