DIRECTOR, DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS, Appellant-Appellee,
v.
SI-NOR, INC., Appellee-Appellant, and CHARLES K. KE-A, Appellee, and HAWAII LABOR RELATIONS BOARD, STATE OF HAWAI`I, Appellee-Appellee
No. 27497
Intermediate Court of Appeals of Hawaii.
February 18, 2009.
On the briefs:
Preston A. Gima, for Appellee-Appellant.
Frances E.H. Lum and J. Gerard Lam, Deputy Attorneys General, for Appellant-Appellee.

MEMORANDUM OPINION
NAKAMURA, Presiding Judge, FUJISE and LEONARD, JJ.
In this secondary agency appeal, Appellee-Appellant Si-Nor, Inc. (Si-Nor) appeals from the Final Judgment, filed on August 16, 2005 in the Circuit Court of the First Circuit (circuit court).[1]

I.

A. Facts of the Case.
As found by the Hawaii Labor Relations Board (HLRB), the essential facts underlying this case are these: On September 30, 2002, Charles K. Ke-a (Ke-a) was involved in a heated verbal and physical incident with his immediate supervisor, Lionel Deguzman (Deguzman). The same day, Ke-a reported to Ryan Hamili (Hamili), Si-Nor's project manager, and Anthony Uwakwe (Uwakwe), Vice-President in Charge of Hawaii Operations, that Deguzman hit him twice. Also on that day, Ke-a sought emergency medical treatment but did not obtain an excuse slip to excuse him from work.
The next day, October 1, 2002, Ke-a spoke by telephone with Uwakwe about the incident, but did not return to work.
On October 2, 2002, Uwakwe met with Ke-a in person to discuss the incident. Uwakwe asked Ke-a to return to work the following day and Ke-a agreed. Ke-a also wrote a letter dated October 2, 2002, addressed to Si-Nor's president, Silas Ugorji (Ugorji), communicating his complaints against Deguzman and his dissatisfaction with the way Hamili and Uwakwe were handling the situation.
On October 3, 2002, Ke-a did not return to work, but called Uwakwe and complained because Deguzman had not been fired as a result of the incident. On the same day, Ke-a obtained a doctor's excuse slip to remain off of work for the period of October 3 to 7, 2002.
On October 4, 2002, Ke-a filed a health and safety complaint with the Hawaii Occupational Safety and Health Division (HIOSH) against Si-Nor based on the September 30, 2002 incident. On October 7, 2002, after returning to Si-Nor's California office, Uwakwe discussed his decision to fire Ke-a with Ugorji. Ke-a returned to work on October 8, 2002.
On October 9, 2002, HIOSH sent a compliance officer to meet with Hamili to begin an investigation of Ke-a's complaint. On the same day, Uwakwe called Deguzman and instructed Deguzman to fire Ke-a. Deguzman did not immediately do so; he issued the termination notice to Ke-a on October 11, 2002.
Hamili and HIOSH both notified Uwakwe of Ke-a's complaint of workplace violence on October 10, 2002. After receiving the termination notice on October 11, 2002, Ke-a filed this discrimination complaint with HIOSH.

B. Procedural History.

1. The Director's Citation.
On December 24, 2002, Appellant-Appellee Director of the State of Hawaii, Department of Labor and Industrial Relations (Director), through HIOSH, determined that Si-Nor violated Hawaii Revised Statutes (HRS) § 396-8(e) by discriminating against Ke-a when Si-Nor terminated Ke-a for participating in a protected activity. The Director determined that: (a) Ke-a engaged in a protected activity when he complained about violence in the workplace to Hamili, Uwakwe, Ugorji and HIOSH; (b) Hamili excused Ke-a from work on October 2, 2002 through the week after the incident, and received a doctor's note from Ke-a on October 8, 2002 covering the period from October 3 through 8, 2002; (c) management "showed animus" when it fired Ke-a for failing to report to work on days Hamili had excused Ke-a from work; (d) "reprisal" was shown when Deguzman terminated Ke-a for failing to return to work on days he had been excused, although Deguzman maintained Ke-a had been terminated for failure to report on October 2 and 3 2002, but did not communicate with other members of management to verify that Ke-a's absence was unexcused, and although prior unauthorized absences were cited as further justification, those absences were reported to Uwakwe three months prior, yet management took no action against Ke-a until after Ke-a made his workplace violence complaint; and (e) Si-Nor terminated Ke-a two days after HIOSH conducted its inspection initiated by Ke-a's complaint. As a penalty, the Director fined Si-Nor, awarded Ke-a back pay, and ordered other remedial measures.

2. The Agency Appeal Before HLRB.
On January 17, 2003, Si-Nor filed a notice of appeal with HLRB, contesting the Director's decision. At the contested case hearing before the HLRB, the parties disagreed about the facts leading up to Ke-a's termination and the testimony presented was conflicting. In its October 27, 2004 "Decision No. 9, Findings of Fact, Conclusions of Law, and Order," HLRB found:
FINDINGS OF FACT
. . . .
2. On September 30, 2002, while driving to Whitmore Village, [Deguzman], SI-NOR'S newly hired quality control manager and KE-A's supervisor, scolded KE-A for not cleaning the hopper of his refuse truck causing it to break down. The other employees in the truck with Deguzman and KE-A, were loyal friends of KE-A. . . .
3. The Board majority finds that KE-A was belligerent and aggressive in responding to Deguzman's questioning over his need to clean the hopper because KE-A did not like the manner in which Deguzman was speaking to him. The explanation KE-A gave to Deguzman was that he had something to do. Thus began a heated argument between KE-A and Deguzman during the ride to Whitmore Village. At one point, the abusive language ended when Deguzman stopped the truck, and stepped out to cool-off. When he re-entered the truck, he apologized and continued driving in relative quiet. When they arrived at Whitmore Village, KE-A went to his refuse truck and prepared to drive out to his route. Rather than driving off to his route, KE-A left his truck to confront Deguzman again. Behind the truck and out of view of [other employees], KE-A pushed Deguzman against the truck. Deguzman swung his fist, hitting KE-A. Based on KE-A's statement that he was in his truck and disembarked when he saw Deguzman walking around the truck, the Board majority finds that KE-A was the aggressor who wanted to end the problem by confronting Deguzman. The Board majority finds the testimony of [other employees] that during the physical altercation Deguzman chased KE-A from around the truck, more self-serving to help their friend KE-A, than credible or reliable. The Board majority credits Deguzman in finding that KE-A baited Deguzman into a fight by pushing him first against the truck. This provoked Deguzman to swing at KE-A, who immediately ran out yelling to his friends to "call the cops." Not wanting to get involved, White and Shannon and Paul Espinda, drove off to their routes, and Deguzman also drove off in his truck and went home for the day. He also filed a police report against KE-A.
4. On September 30, 2002, KE-A complained to the police, and SI-NOR's project manager [Hamili] and [Uwakwe] that Deguzman hit him twice, threatened his life, and also tried to run him down with his truck as he was leaving Whitmore Village. The Board majority credits the testimony of Deguzman over KE-A, Shannon and Paul Espinda, and White, and finds that Deguzman swung at KE-A after KE-A pushed him against the truck, but Deguzman did not threaten KE-A's life; did not try to run KE-A down with the truck upon exiting Whitmore Village; or threaten the [other employees] not to say anything.
5. After filing a police report, KE-A drove to his girlfriend's house in Kaneohe, and stopped on the way at Castle Memorial Hospital for emergency treatment. He did not obtain a work slip to excuse him from work on October 1 and 2, 2002.
6. On October 1, 2002, Deguzman returned to work. Instead of returning to work, KE-A spoke by phone with Uwakwe who assumed management's responsibility of investigating the fight and deciding what action to take. Hamili informed KE-A that the matter was out of his control since Uwakwe was handling the matter. KE-A refused to meet with Uwakwe and Deguzman, but agreed to meet only with Uwakwe on October 2, 2002.
7. On October 2, 2002, at a face-to-face meeting with Uwakwe, KE-A reported his version of the fight. According to KE-A, Uwakwe wanted to know more about why his hopper had not been cleaned. The Board majority credits the testimony of Uwakwe, that when he met with KE-A on October 2, 2002, KE-A had no visible injuries to his face. He did not complain to Uwakwe of any migraine headaches, depression, or his alleged fear of Deguzman, which would prevent him from returning to work on October 3, 2002. Uwakwe asked KE-A to report back to work on October 3, 2002 and KE-A unequivocally agreed.
9.[2] Sometime on October 2, 2002, after meeting with Uwakwe, KE-A "learned . . . that [Deguzman] was still working and that he had been the whole time. . . . He then called [Uwakwe] and asked him why he had to return to work when [Deguzman] was still working and nothing had been done about the situation. Uwakwe said: You don't make the decision for this company. I do. And if you don't like it, then it's up to you. . . . He then hung up on KE-A." KE-A understood that he had to return to work under [Deguzman]. . . . He didn't want to do that. Either that or he got to quit. So that's how he figured it to be."
10. KE-A testified that on October 3, 2002 while on his way to work, he called Hamili, who said not to come in because they were one truck short. Hamili rebutted KE-A by testifying that KE-A came to work for a couple of hours, but left because he wanted to go for medical treatment for a migraine headache. Deguzman testified that he did not see KE-A or Hamili at the baseyard on October 3, 2002. The Board majority credits neither KE-A, nor Hamili, but rather Deguzman and Uwakwe, who had arrived at the baseyard at 7:30 a.m., expecting KE-A to report to work to "make sure he was there when [Deguzman] is also in the yard, just to avoid any other confrontation, and then to be able to talk to both of them together." Instead of showing up to work, KE-A called Uwakwe and complained because [Deguzman] had not been fired.
11. On October 3, 2002, KE-A presented himself for treatment at Straub Clinic & Hospital where he obtained a work slip to remain off work from October 3, 2002 through October 7, 2002, and returned for a followup checkup on October 8, 2002. Even though Hamili nformed KE-A that Uwakwe had assumed responsibility for handling the fight situation, KE-A communicated only with Hamili, regarding his whereabouts after October 3, 2002, when he did not report back to work as instructed by Uwakwe, because Deguzman had not been fired.
12. On October 4, 2002, KE-A filed a safety/health complaint with HIOSH against SI-NOR based on the fight with Deguzman on September 30, 2002. KE-A admitted that what he sought from filing the complaint was to get Deguzman fired. The Board majority finds that after insisting that Uwakwe fire Deguzman, KE-A followed through on his threat to Uwakwe by complaining to the mainland, i.e., to [Ugorji]. On October 3, 2002, KE-A deliberately refused to return to work because Deguzman had not been fired. The Board majority finds that KE-A's filing of his complaint with HIOSH on October 4, 2002 was part of his scheme to get Deguzman fired and undermine SI-NOR's management authority.
13. After returning to SI-NOR's California office on October 7, 2002, Uwakwe met with Ugorji about his decision to terminate KE-A primarily for being insubordinate to Deguzman and challenging him into a verbal and physical fight over the need to clean his hopper, and for being insubordinate to Uwakwe by disobeying his instruction to return to work on October 3, 2002. In addition, Uwakwe had warnings that KE-A had been falsifying his hours of work by not showing up for work on Wednesdays and Saturdays, but receiving pay for those hours.
14. On October 8, 2002, KE-A returned to work because he expected HIOSH to start its complaint inspection . . . . Upon returning to work, KE-A was assigned to a crew covering the Hickam contract and supervised by SI-NOR's project manager Chad Pasoquen (Pasoquen), who was also a friend of KE-A's. This assignment was pre-arranged by Hamili.
15. On October 9, 2002, HIOSH compliance officer, Hervie Messier met with Hamili to conduct an opening conference and inspection. . .
16. Also on October 9, 2002, Uwakwe called Deguzman and instructed him to terminate KE-A and which is the day the Board majority finds Deguzman issued termination notices to [two other workers]. Deguzman relied on his wife to type out the disciplinary action slips to [two other workers] on October 8, 2002, after receiving the forms from SI-NOR on October 7, 2002. Deguzman testified before the Board . . . that he did not issue a termination notice to KE-A on that day because earlier that morning he had just issued termination notices to [two other workers], who were both angry and had threatened Deguzman and he "didn't want to get three guys pissed off at him in one day."
. . . .
18. Deguzman did not issue the termination notice to KE-A until October 11, 2002, after waiting a couple of days. Deguzman testified that in a phone call with Uwakwe about KE-A's termination Uwakwe was upset at KE-A for "making some problems . . . . About going to OSHA and labor board and all that." While the Board Majority credits Deguzman, his testimony is unclear as to when this conversation occurred. Nevertheless, based on the record, it is reasonable to infer that it probably occurred in a phone conversation with Uwakwe on or about October 10, 2002, after Uwakwe was notified by Hamili and the HIOSH compliance officer. . . of the complaint-based inspection on workplace violence that began on October 9, 2002. . . .
19. On October 11, 2002, Deguzman issued the termination notice to KE-A stating his reasons as follows:
No show for work on Wed. 10/02/02, [T]hurs. 10/03/02, Fri. 10/04/02, Sat. 10/05/02, Mon. 10/07/02. Refuses to work with me [Deguzman]. Carries himself with a very insubordinate attitude towards me [Deguzman], intending to provoke physical confrontation at the work site. I, [Deguzman](supervisor) is unable to tell [Ke-a] what he needs to do or where he needs to go when something needs to be done or when he is needed to help the others because of his insubordinate attitude towards me [Deguzman]. [Ke-a] does not work on Wednesdays and Saturdays. Why? I don't know.
20. On October 11, 2002, only after he was terminated by Deguzman, KE-A faxed to SI-NOR a copy of Dr. Kubo's work slip excusing him from work from October 3, 2002 to October 8, 2002, and filed this discrimination complaint with HIOSH. Based on the testimony that Hamili was not at SI-NOR's baseyard on a daily basis to oversee the operations and assignment of crews, which had been left to Deguzman, and Hamili's working a second full time job, the Board majority does not find credible KE-A's testimony that he gave the work slip from Dr. Kubo excusing him from work from October 3 to 8, 2002, to Hamili upon returning to work on October 8, 2002, nor Hamili's testimony that he received the work slip from KE-A and faxed to SI-NOR's headquarters when he returned to work.
. . . .
26. Deguzman's write up terminating KE-A was based on his supervision over him, and not the reasons given by Uwakwe when he ordered Deguzman to terminate KE-A on October 9, 2003. [sic] Nevertheless, Uwakwe's determination that KE-A was insubordinate is consistent with Deguzman's reports and supported by the record. Deguzman had never received from KE-A or Hamili the work slip from Dr. Kubo, excusing him from work from October 3, 2002 to October 7, 2002. The Board majority credits Deguzman's testimony that had he been given the doctor's note from KE-A, he would not have written him up for not showing up to work on those days. The Board majority finds, therefore, that Deguzman and Uwakwe's reasons for terminating KE-A based on his insubordinate conduct and animus toward Deguzman, was probably more true than false, and not because of animus or reprisal for filing his complaint of workplace violence.
27. The Board majority finds that even if Uwakwe was upset with KE-A for filing a complaint of workplace violence with HIOSH, it was not a substantial factor. On December [sic] 7, 2002, Uwakwe had discussed with Ugorji his decision to terminate KE-A for being insubordinate to Deguzman, as well as to Uwakwe. Uwakwe instructed Deguzman to terminate KE-A on October 9, 2002, on the same day HIOSH began its opening conference with Hamili. The testimony of Hamili and the HIOSH [investigator] is consistent, that both notified Uwakwe of the complaint of workplace violence on October 10, 2002. Given the choice between KE-A, with his defiant and insubordinate attitude versus Deguzman, whom the Board majority finds was doing his best to enforce the work rules, regulate time cards and discipline an unruly workforce, SI-NOR had a legitimate business reason for terminating KE-A. Hence, the Board majority is not convinced that KE-A's exercise of protected activity, i.e., complaints to SI-NOR and HIOSH about workplace violence, was a substantial factor in [Si-Nor's] decision to terminate [KE-A], or that insubordination was a pretext for discrimination.
(Citations, footnotes, and original brackets omitted).
The HLRB majority[3] concluded that Si-Nor proved that it had a legitimate reason to fire Ke-a, i.e., for his acts of insubordination, that the Director failed to carry his burden of proving Ke-a's protected activity, i.e., his complaints of workplace violence, was a substantial factor in Si-Nor's decision to fire him or that Si-Nor's reasons for the termination 
Ke-a's insubordinate attitude and refusal to report for work on October 3, 2002  were a pretext for firing Ke-a. The Director filed a Notice of Appeal to the circuit court.

3. The Appeal Before the Circuit Court.
Before the circuit court, the Director focused on Uwakwe's conversation with Deguzman after Uwakwe learned of Ke-a's complaint, and argued that it showed Uwakwe was upset with Ke-a for filing the complaint and therefore that Si-Nor took an adverse employment action against Ke-a because of protected activity.
In response, Si-Nor argued that the Director's version of the events was based on the testimony of Hamili and Ke-a, which had been discredited by the HLRB, and that the phone call between Uwakwe and Deguzman during which Uwakwe expressed his displeasure with Ke-a for filing the complaint, was made after Uwakwe had decided to fire Ke-a and communicated that decision to Deguzman.
In rebuttal, the Director argued that even if Uwakwe made his decision to fire Ke-a before learning of the HIOSH complaint, the reason given for the firing  not reporting for work  was not justified because (1) Ke-a had reported an incident of workplace violence to Hamili and Uwakwe and was afraid to return to work because Si-Nor had not made provisions to protect him, and (2) he had a doctor's slip for the absence.
The circuit court ruled that: (1) as a matter of law, the HLRB erred in failing to find Si-Nor's reasons for firing Ke-a were pretextual; (2) Uwakwe's statement to Deguzman that he was upset with Ke-a for filing the HIOSH complaint "warrants a reversal of the [HLRB's] decision that there was no discrimination in this case[,]" as it was direct evidence of discrimination and at the time it was made was the only reason given for terminating Ke-a; and (3) the reasons given by Si-Nor for firing Ke-a were "specious" because Ke-a's failure to return to work was justified by Si-Nor's failure to take steps to protect Ke-a from Deguzman, and by Ke-a's doctor's slip. Accordingly, the circuit court reversed the HLRB's Decision in favor of Si-Nor by order and judgment entered on August 16, 2005. Si-Nor timely filed a notice of appeal from this judgment, which we now consider.

II.

A. Points on Appeal.
Si-Nor raises fourteen points on appeal. Si-Nor structured these challenges in five major sections of argument. This court will resolve them in one.[4]
Si-Nor argues that the circuit court erred in not deferring to the HLRB's determinations of credibility. Si-Nor argues that "virtually all of the issues raised in the Director's appeal . . . were decided by the Board's determination of credibility and weight." Si-Nor also challenges the circuit court's determination that Si-Nor discriminated against Ke-a. Si-Nor argues that although Ke-a and the Director presented a prima facie case of discrimination, (1) Si-Nor responded with legitimate reasons for terminating Ke-a that were not pretextual, (2) Si-Nor's decision to fire Ke-a was made prior to Si-Nor learning of the HIOSH complaint and prior to the statement by Uwakwe to Deguzman, and (3) Ke-a's complaint was not a substantial factor in the termination decision.
Thus, the question before us is whether the circuit court improperly reversed the HLRB based on the court's disagreement with the HLRB's credibility determinations that were the foundation for HLRB's determination that the Director failed to prove his case of retaliation under the Hawaii Occupational Safety and Health Law.

B. Standard of Review.
When an appellate court reviews a circuit court's review of an agency decision, it is considered a secondary appeal. Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawai`i 184, 193, 159 P.3d 143, 152 (2007). In secondary appeals, the "standard of review is one in which th[e] court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) [(1993)] to the agency's decision." Id. (citing Korean Buddhist Dae Won Sa Temple of Hawai`i v. Sullivan, 87 Hawai`i 217, 229, 953 P.2d 1315, 1327 (1998)). HRS § 91-14(g) provides:
Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Thus, conclusions of law should be reviewed de novo under subsections (1), (2), and (4). Id. Factual determinations should be reviewed for clear error under subsection (5). Id; see also Morgan v. Planning Dep't., County of Kauai, 104 Hawai`i 173, 179, 86 P.3d 982, 988 (2004). If both mixed questions of fact and law are presented, the clearly erroneous standard is used "because the conclusion is dependent upon the facts and circumstances of the particular case." In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Molokai), Inc., 116 Hawai`i 481, 489, 174 P.3d 320, 328 (2007).
"An agency's findings are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record." Poe v. Hawai`i Labor Relations Bd., 87 Hawai`i 191, 195, 953 P.2d 569, 573 (1998) (citing Alvarez v. Liberty House, Inc., 85 Hawai`i 275, 277, 942 P.2d 539, 541 (1997); HRS § 91-14(g)(5)). "'An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.'" Poe v. Hawai`i Labor Relations Bd., 105 Hawai`i 97, 100, 94 P.3d 652, 655 (2004) (quoting Kilauea Neighborhood Ass'n v. Land Use Comm'n, 7 Haw. App. 227, 229-30, 751 P.2d 1031, 1034 (1988)).
Tauese v. State of Hawai`i, Dep't of Labor & Indus. Relations, 113 Hawai`i 1, 25, 147 P.3d 785, 809 (2006).
In addition, "deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency." Dole Hawaii Div.-Castle & Cooke, Inc. v. Ramil, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990). Particularly, "the credibility of witnesses and the weight to be given their testimony are within the province of the trier of fact and, generally, will not be disturbed on appeal." Tamashiro v. Control Specialist, Inc., 97 Hawai`i 86, 92, 34 P.3d 16, 22 (2001).

III.
Retaliation against employees for reporting workplace safety issues is prohibited by HRS § 396-8(e)(3) (1993), which provides:
(e) Discharge or discrimination against employees for exercising any right under this chapter is prohibited. In consideration of this prohibition:
. . . .
(3) No person shall discharge or in any manner discriminate against any employee because the employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or intends to testify in any such proceeding, or acting to exercise or exercised on behalf of the employee or others any right afforded by this chapter[.]
Every employer is required to adopt practices "adequate to render such employment and place of employment safe." HRS § 396-6(b) (1993).
The HLRB used a three-part analysis in evaluating Ke-a's claim of retaliation that is commonly used in other claims of workplace discrimination: first, the employee must make an initial showing of retaliation; second, the employer must then come forward with legitimate, nondiscriminatory reasons for the employment action; and if it does so, the employee must show the employer's reasons were a pretext for the discrimination. See Shoppe v. Gucci America, Inc., 94 Hawai`i 368, 14 P.3d 1049 (2000) (age discrimination) citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (race discrimination).
While the HLRB found the Director and Ke-a made out a prima facie case of retaliation, it also found Si-Nor presented legitimate reasons for firing Ke-a and that the Director failed to show that those reasons were pretextual. The HLRB reached these conclusions largely based on the testimony it found credible. It is well-established that credibility and weight to be given to testimony is within the province of the trier of fact. Tamashiro, 97 Hawai`i at 92, 34 P.3d at 22.
The HLRB believed Deguzman and credited his testimony regarding the altercation that started this chain of events. It found that Ke-a was "belligerent and aggressive" in responding to Deguzman's admonishment that Ke-a should have cleaned the hopper of his truck and that when they all reached the work site, that Ke-a left his truck to confront Deguzman and, when out of the view of others, pushed Deguzman against the truck. Deguzman then swung his fist, hitting Ke-a.
This view of the altercation formed the basis of the HLRB's view that Ke-a's intent in reporting the incident to Si-Nor and HIOSH was to have Deguzman fired rather than to protect himself from further workplace violence. This conclusion calls into question whether Ke-a was involved in protected activity at all in reporting a safety hazard of his own making. While the complainant's underlying discrimination claim need not be sustained in order to make out a good claim for retaliation, there must be a reasonable belief that there was an unlawful employment practice. See Gonsalves v. Nissan Motor Corp. in Hawai`i, Ltd., 100 Hawai`i 149, 162-63, 58 P.3d 1196, 1209-10 (2002).
As to the validity of the employer's reasons for discharge, here too, the HLRB made credibility determinations in Si-Nor's favor. In considering Si-Nor's assertion of insubordination by Ke-a by instigating the altercation, the HLRB explicitly found Deguzman's testimony the more credible in determining that Ke-a, in fact, was the instigator. With regard to Si-Nor's claim of insubordination when Ke-a did not return to work on October 3, 2002, the HLRB credited Uwakwe's testimony that Ke-a did not, at their October 2, 2002 meeting, show any visible injuries to his face nor did Ke-a complain of migraine headaches, depression, or his alleged fear of Deguzman, which would have provided a justification for Ke-a's failure to return to work the next day. The HLRB also believed Uwakwe who testified that (1) he was present at the base yard on October 3, 2002 at 7:30 a.m. to talk with Ke-a and Deguzman and to make sure there was no further altercation between them, and (2) rather than show up for work, Ke-a called Uwakwe to complain because Deguzman had not been fired. Thus, based on the testimony that the HLRB found credible, Si-Nor had legitimate reasons for firing Ke-a.
Finally, again based largely on testimony credited by the HLRB, the HLRB found that the Director failed to prove the reasons for termination given by Si-Nor were a mere pretext. The Director argued that Ke-a's failure to return to work on October 3, 2002 was excused because Ke-a was afraid of Deguzman and because Ke-a had a valid excuse slip from his doctor for that date. The former argument was already rejected by the HLRB's determination that, based on Deguzman's credible testimony, Ke-a had actually instigated the altercation as part of a scheme to get Deguzman fired, and thus did not fear Deguzman. Rejection of the latter reason was supported by Uwakwe's testimony that Ke-a did not display any visible injuries, did not complain of any maladies that would have prevented him from coming to work and, in addition, Uwakwe testified that when Ke-a called him on October 3, 2002 to complain about Deguzman not being fired, Ke-a said nothing about going to the doctor.
As the HLRB's findings are supported by the substantial, credible evidence presented to it, we are not left with the firm and definite belief that a mistake has been made and thus must reinstate the decision to overturn the Director's citation and penalty.

IV.
The Final Judgment, filed on August 16, 2005 in the Circuit Court of the First Circuit, is reversed.
NOTES
[1] The Honorable Eden E. Hifo presided.
[2] There is no paragraph 8 in the original.
[3] Member Chester C. Kunitake dissented, voicing his opinion that Ke-a was more credible than Deguzman and that insufficient weight was given to Ke-a's workers compensation claim. He further cited the "total confusion" over whether Hamili or Deguzman was Ke-a's supervisor, Ke-a's HIOSH complaint, Deguzman's testimony regarding Uwakwe's reasons for Ke-a's termination, Deguzman's documentation of Ke-a's termination, and Uwakwe's inconsistencies in his rationale for firing Ke-a in concluding that Ke-a was terminated for filing his HIOSH complaint and his worker's compensation claim.
[4] Si-Nor argues that the Director lacked standing to appeal to the circuit court because Ke-a did not appeal, and that "the Director's case is dependent upon and derivative of Mr. [Ke-a's] case." Si-Nor did not designate this as a point on appeal. Thus, even if the argument had merit, it has been waived. Hawai`i Rules of Appellate Procedure Rule 28(b)(4) ("Points [of error] not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented."); see also Earl M. Jorgensen Co. v. Mark Constr., Inc., 56 Haw. 466, 475-76, 540 P.2d 978, 985 (1975) ("A judgment ordinarily will not be reversed upon a legal theory not raised by the appellant in the court below. This is the general rule to which an appellate court will adhere, unless and until justice otherwise requires." (Citations omitted.))

In any event, HRS § 396-4(d)(7)(1993) gives the Director the right to defend the decisions of the department. That section states:
The department may prosecute, defend and maintain actions in the name of the department for the enforcement of the provisions of this chapter, including the enforcement of any order issued by it, the appeal of any administrative or court decision, and other actions necessary to enforce this chapter.
HRS § 396-4(d)(7).
The Director sought to defend the department's decision that Si-Nor violated HRS § 396-8(e)(3) by terminating Ke-a when it appealed from the HLRB's decision to the circuit court. Thus, the Director was acting according to statutory authority and had standing to bring the appeal.